The STATE of Ohio, Appellant,

v.

CARLSON, Appellee.

[Cite as *State v. Carlson* (1995), 102 Ohio App.3d 585.]

Court of Appeals of Ohio,
Ninth District, Medina County.

No. 2359–M.

Decided April 19, 1995.

*Dean Holman,* Medina County Prosecuting Attorney, and *Robert B. Campbell,* Assistant Prosecuting Attorney, for appellant.

*Gordon S. Friedman,* for appellee.

REECE, Judge.

Appellant, the state of Ohio, appeals from the trial court's order suppressing evidence of drug trafficking obtained during a traffic stop of the defendant-appellee, Holly Carlson. We reverse.

On January 23, 1994, Trooper Terry Helton of the Ohio State Highway Patrol was patrolling Interstate 71 in Medina County. Carlson was traveling north on I–71 in a Toyota pickup truck. Using a laser measuring device, Trooper Helton clocked Carlson's pickup traveling seventy-five m.p.h. in a sixty-five m.p.h. zone. On the basis of the laser reading, Trooper Helton stopped the pickup for excessive speed. According to the patrol's radio log, Trooper Helton made the stop at 1:25 p.m.

Once stopped, Trooper Helton approached the vehicle, and Carlson produced a New Hampshire driver's license. Trooper Helton told Carlson that she had been stopped for speeding, and he asked for her vehicle registration. Carlson produced a California vehicle registration in the name of Michael Laser. Carlson explained that Laser was her boyfriend and that she was traveling from California to her home in New Hampshire. After a brief discussion, Trooper Helton told Carlson that he was going to issue a written warning for the speeding violation "if everything checked out with her driver's license," and he asked Carlson to accompany him to his patrol cruiser so he could "write up the written warning and also run a check on her New Hampshire driver's license." Carlson complied and sat in the front passenger seat of the cruiser.

Trooper Helton radioed Carlson's driver's license number to dispatch at 1:29 p.m. At the same time, Trooper Helton requested that Trooper Robert Burns be dispatched to the location of Carlson's pickup. Trooper Burns is a dog handler with the patrol's K–9 drug unit and travels with a trained drug dog in his cruiser. When he received Trooper Helton's request, Trooper Burns was five miles away conducting his own traffic stop. According to the patrol's radio log, Trooper Burns completed his traffic stop two minutes later. Trooper Burns testified that he arrived at the location of Carlson's pickup within ten minutes of receiving Trooper Helton's request.

Upon arrival, Trooper Burns briefly talked with Trooper Helton and then he retrieved his drug dog, Rex, from his cruiser. Trooper Burns walked Rex around the pickup, and Rex alerted to the odor of narcotics by scratching and biting on the passenger side of the truck near the cab and near the front of the pickup's enclosed bed-cap. At the time of Rex's alert, Carlson had been detained for approximately nineteen minutes.

After Rex alerted, Trooper Helton placed Carlson in the rear of his cruiser, and he and Trooper Burns began a search of the pickup. They searched the cab

first and found cigarette rolling papers and a package of metal screens, which Trooper Helton indicated are commonly used in drug pipes. The officers then opened the locked bed-cap and observed several duffel bags and a suitcase. Trooper Burns retrieved Rex and directed him into the truck bed. Rex alerted to the odor of drugs from one of the duffel bags. The officers opened the bag and found a one-hundred-seven-pound bale of marijuana.

Carlson moved to suppress the evidence found during the search of the pickup. After the suppression hearing, the trial court granted the motion, stating several reasons for its decision in a very detailed opinion. The state appeals, raising two assignments of error. In response to the state's appeal, Carlson argues in favor of the trial court's reasoning and proffers several additional Fourth Amendment arguments which she contends also support the trial court's decision. Because we are reversing that decision, we will address Carlson's additional arguments as part of our review. We begin with the propriety of the initial traffic stop.

## A. PRETEXT

The trial court found that the initial traffic stop was a valid investigative stop for a speeding violation. In light of the laser speed reading, Carlson does not dispute that Trooper Helton had a reasonable suspicion that she was exceeding the speed limit. Carlson argues, however, that Trooper Helton used the speeding violation merely as pretext so that he could conduct an otherwise unjustifiable drug interdiction stop and search for contraband. In support of her argument, Carlson points to Trooper Helton's testimony that he is assigned to a traffic drug interdiction unit and has received special training in drug interdiction methodology. On the basis of Trooper Helton's drug interdiction assignment and training, Carlson contends that but for certain drug courier "indicators," such as her out-of-state license plates and the type of vehicle she was driving, Trooper Helton would have been uninterested in stopping her for the speeding violation.

As defined by the United States Tenth Circuit Court of Appeals, a pretextual traffic stop occurs when a police officer uses a minor traffic violation to stop a vehicle in order to inquire into an unrelated, more serious crime for which the officer may have a hunch, but does not possess the level of suspicion necessary to justify an investigative detention. *United States v. Guzman* (C.A.10, 1988), 864 F.2d 1512, 1515. The Tenth Circuit has suggested that "[t]he classic example * * * occurs when an officer stops a driver for a minor traffic violation in order to investigate a hunch that the driver is engaged in illegal drug activity." *Id.*

Although most courts recognize some form of pretext argument, it is clear that "[t]he U.S. Supreme Court has never proscribed pretextual traffic stops." *Unit-*

*ed States v. Millan* (C.A.9, 1994), 36 F.3d 886, 888, fn. 1. In the absence of a direct Supreme Court pronouncement on the issue, appellate courts are in disagreement as to how an alleged pretextual traffic stop should be reviewed. We take this opportunity to resolve the issue in this appellate district.

Through the holdings in *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, and *Delaware v. Prouse* (1979), 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660, the United States Supreme Court established the basic standard for reviewing the propriety of a traffic stop. Under that standard, before a law enforcement officer may stop a vehicle, the officer must have a reasonable suspicion, based on specific and articulable facts, that an occupant is or has been engaged in criminal activity. As defined in *Terry* and its progeny, a reasonable suspicion is something less than probable cause. *State v. VanScoder* (1994), 92 Ohio App.3d 853, 855, 637 N.E.2d 374, 375–376.

The federal circuits have employed two principal approaches in reviewing pretextual traffic stop claims. Under the first approach, the court reviews the defendant's pretextual traffic stop claim using the traditional *Terry* standard of reasonable suspicion, *i.e.,* if the traffic stop was supported by reasonable suspicion, then no further inquiry into the propriety of the stop is necessary. In applying this approach, the Eighth Circuit has held that "[a]ny traffic violation, however minor, provides [reasonable suspicion] for a traffic stop." *United States v. Bloomfield* (C.A.8, 1994), 40 F.3d 910, 915. Furthermore, "[i]f the officer is legally authorized to stop the driver, any additional 'underlying intent or motivation' does not invalidate the stop." *Id.,* quoting *United States v. Cummins* (C.A.8, 1990), 920 F.2d 498, 501. In addition to the Eighth Circuit, the Second, Fourth, Fifth, Sixth, Seventh, and District of Columbia Circuits have all adopted the traditional *Terry* approach as the proper standard for reviewing pretextual traffic stop claims.[1]

The second approach to pretextual traffic stop claims, which has been adopted by the Tenth and Eleventh Circuits, adds an additional element to the traditional *Terry* inquiry. Under the second approach, it is not enough that the traffic stop was supported by reasonable suspicion. Rather, in determining whether the stop was pretextual, "the proper inquiry * * * is not whether the officer *could* validly have made the stop, but whether under the same circumstances a reasonable

---

1. Some of the circuits adopting the traditional *Terry* approach have employed language slightly different from that used by the Eighth Circuit in *Bloomfield* and *Cummins*. Under any of these semantic variations, however, the end result is the same: if the traffic stop is supported by reasonable suspicion, then no further inquiry into the propriety of the stop is necessary. See, *e.g., United States v. Scopo* (C.A.2, 1994), 19 F.3d 777, 782–785; *United States v. Jeffus* (C.A.4, 1994), 22 F.3d 554, 557; *United States v. Roberson* (C.A.5, 1993), 6 F.3d 1088, 1092; *United States v. Ferguson* (C.A.6, 1993), 8 F.3d 385, 391; *United States v. Fiala* (C.A.7, 1991), 929 F.2d 285, 287; *United States v. Mitchell* (C.A.D.C.1991), 951 F.2d 1291, 1295.

officer *would* have made the stop in the absence of [an] invalid purpose." (Emphasis *sic*.) *United States v. Smith* (C.A.11, 1986), 799 F.2d 704, 709; *Guzman*, 864 F.2d at 1517.

At the core of the *Guzman* and *Smith* reasonable officer approach is an inquiry into the usual and customary practices of the police department. If, under those practices, a reasonable officer would have been uninterested in pursuing the defendant's minor traffic violation, then the court must conclude that the traffic violation was used merely as a pretext to investigate an unrelated, more serious crime for which the officer did not have reasonable suspicion. As explained by the *Guzman* court, "the proper basis of concern is not *why* the officer deviated from the usual practice * * * but simply that he *did* deviate." (Emphasis *sic*.) 864 F.2d at 1517.[2]

The Supreme Court of Ohio has not spoken directly on the issue of pretextual traffic stops. However, this state's First, Second, Eleventh, and Twelfth Appellate Districts have elected to follow the reasonable officer approach in *Guzman* and *Smith*. See, *e.g.*, *State v. Bishop* (1994), 95 Ohio App.3d 619, 622, 643 N.E.2d 170, 171–172; *State v. Richardson* (1994), 94 Ohio App.3d 501, 506–507, 641 N.E.2d 216, 219–220; *State v. Spencer* (1991), 75 Ohio App.3d 581, 585, 600 N.E.2d 335, 337; *State v. Whitsell* (1990), 69 Ohio App.3d 512, 522–524, 591 N.E.2d 265, 271–273. After careful consideration of both approaches and a thorough review of the prior decisions in this district, we do not agree with our sister appellate courts.

In *State v. Shook* (June 15, 1994), Lorain App. No. 93CA005716, unreported, at 4, 1994 WL 263194, the defendant claimed that his traffic stop was not based on a reasonable and articulable suspicion of criminal activity but instead was merely a pretext for a search based on a drug courier profile. In reviewing the defendant's claim, we began with the traditional *Terry* standard: "Before stopping a vehicle, a law enforcement officer must have a reasonable suspicion, based on specific and articulable facts, that an occupant is or has been engaged in criminal activity." From that standard, we concluded that "if the specific and articulable facts available to an officer indicate that a driver may be committing a criminal act, which includes the violation of a traffic law, the officer is justified in making an investigative stop." See, also, *State v. Hunt* (Dec. 7, 1994), Lorain App. No. 94CA005795, unreported, at 4, 1994 WL 686834 ("Based on *Shook*, a traffic stop will not be pretextual if the officer had specific and articulable reasons to believe the driver was violating the law.").

---

**2.** In addition to the Tenth and Eleventh Circuits, the Ninth Circuit also appears to prefer the reasonable officer approach, although it has not expressly adopted this standard of review. See, *e.g.*, *United States v. Perez* (C.A.9, 1994), 37 F.3d 510, 512–513; *Millan*, 36 F.3d at 888–889.

From a reading of *Shook* and *Hunt,* this court has implicitly, if not explicitly, rejected the reasonable officer approach in *Guzman* and *Smith.* We find no reason to reverse our course. Rather, we reaffirm our belief that the traditional *Terry* approach is the proper standard for reviewing pretextual traffic stop claims. We find considerable support for our position from the fact that a clear majority of federal circuits have adopted this approach. Of those federal circuits, we find the Sixth Circuit's *en banc* decision in *Ferguson* to be particularly compelling. In that case, the *en banc* panel overruled the circuit's earlier approval of *Guzman* and *Smith* and readopted the traditional *Terry* standard of review:

"We hold that so long as the officer has [reasonable suspicion] to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment. We focus not on whether a reasonable officer 'would' have stopped the suspect * * * or whether any officer 'could' have stopped the suspect, but on whether this particular officer in fact had [reasonable suspicion] to believe that a traffic offense had occurred, regardless of whether this was the only basis or merely one basis for the stop. The stop is reasonable if there was [reasonable suspicion], and it is irrelevant what else the officer knew or suspected about the traffic violator at the time of the stop. It is also irrelevant whether the stop in question is sufficiently ordinary or routine according to the general practice of the police department or the particular officer making the stop." (Citations omitted.) 8 F.3d at 391.

▮ We believe that *Ferguson* represents a proper balance of Fourth Amendment interests. The primary purpose of the Fourth Amendment is to impose a standard of reasonableness upon the exercise of discretion by law enforcement officers in order to " 'safeguard the privacy and security of individuals against arbitrary [governmental] invasions.' " *Prouse,* 440 U.S. at 653, 99 S.Ct. at 1396, 59 L.Ed.2d at 667, quoting *Marshall v. Barlow's, Inc.* (1978), 436 U.S. 307, 311–313, 98 S.Ct. 1816, 56 L.Ed.2d 305, 311. Under a standard of reasonableness, the legality of a Fourth Amendment intrusion is judged by balancing the impact of the intrusion upon the individual's privacy rights against the government's legitimate interest in protecting its citizens from crime. In applying this balancing test in *Prouse,* the Supreme Court reaffirmed its belief that "a requirement of reasonable suspicion for [traffic] stops allows the Government adequate means of guarding the public interest and also protects [motorists] from indiscriminate official interference." *Prouse,* 440 U.S. at 656, 99 S.Ct. at 1397, 59 L.Ed.2d at 669, quoting *United States v. Brignoni–Ponce* (1975), 422 U.S. 873, 883, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607, 617. Moreover, the court recognized that "[t]he foremost method of enforcing traffic and vehicle safety regulations

* * * is acting upon observed violations." *Prouse,* 440 U.S. at 659, 99 S.Ct. at 1399, 59 L.Ed.2d at 671.

 Given the United States Supreme Court's long-standing belief that the reasonable suspicion standard sufficiently safeguards a motorist's privacy interests, we find no reason to subject the review of traffic stops to the additional level of inquiry contained in the *Guzman* and *Smith* reasonable officer test. Therefore, we hold that all challenges to the validity of a traffic stop are subject to the same *Terry* standard of review, regardless of whether the defendant raises allegations of pretext. Under that standard, a law enforcement officer must have a reasonable suspicion, based on specific and articulable facts, that a motorist is or has been engaged in criminal activity before stopping a vehicle. No further inquiry beyond the requirement of reasonable suspicion is necessary or warranted. Thus, if the specific and articulable facts available to an officer indicate that a motorist may be committing a criminal act, which includes the violation of a traffic law, the officer is justified in making an investigative stop.

 In this case, the trial court found that the initial traffic stop of Carlson's pickup was a valid investigative stop for a speeding violation. We agree. Trooper Helton testified that using a laser measuring device, he clocked Carlson's pickup traveling seventy-five m.p.h. in a sixty-five m.p.h. zone. Based on this specific and articulable factual information, Trooper Helton could have reasonably suspected that Carlson was violating R.C. 4511.21, Ohio's traffic law governing speed limits for the operation of motor vehicles. Because Trooper Helton possessed a reasonable suspicion that Carlson was violating the speed limit law, he was justified in making an investigative stop. No further inquiry is necessary, and the trial court's decision as to the initial traffic stop is affirmed.

## B. DOG SNIFF (REASONABLE SUSPICION)

Two issues arise with respect to the dog sniff of Carlson's pickup. The first issue is whether Trooper Helton needed to have a reasonable suspicion of drug-related activity before requesting that Trooper Burns bring the drug dog to the scene. The second issue is whether the drug dog's alert to the odor of narcotics constituted probable cause to search the pickup. We will address the reasonable suspicion issue in this section of the opinion and discuss the probable cause issue in a later section.

In its opinion, the trial court found that a dog sniff is a search under the Fourth Amendment and that therefore, Trooper Helton needed at least some "articulable suspicion" of drug-related activity before "bring[ing] the dog to the scene." Relying on this erroneous statement of the law, the trial court concluded

that the "collection of innocent factors" cited by Trooper Helton was insufficient to justify "calling out the drug dog."

In *Shook*, we specifically addressed this issue based on *United States v. Place* (1983), 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110. In *Place*, the Supreme Court held that the exterior canine sniff of an item located in a public place, in that case luggage, did not constitute a search within the meaning of the Fourth Amendment. In applying *Place* to the investigative stop of an automobile, we found that because a dog sniff is not a search under the Fourth Amendment, "both Ohio and federal courts have [concluded] that 'an individualized reasonable suspicion of drug-related criminal activity is not required when the dog sniff is employed during a lawful seizure of the vehicle.'" *Shook* at 7–8, quoting *United States v. Morales–Zamora* (C.A.10, 1990), 914 F.2d 200, 203.[3]

■ In other words, if a vehicle is lawfully detained, an officer does not need a reasonable suspicion of drug-related activity in order to request that a drug dog be brought to the scene or to conduct a dog sniff of the vehicle. Accordingly, once Carlson was lawfully detained for the traffic violation, Trooper Helton did not need a reasonable suspicion of drug-related activity in order to request that Trooper Burns bring his drug dog to the scene. Likewise, neither trooper needed a reasonable suspicion of drug-related activity in order to conduct the dog sniff while Carlson was lawfully detained. The pivotal issue then is not why the troopers conducted the dog sniff but whether they conducted it while Carlson was lawfully detained.

## C. SCOPE AND DURATION OF THE DETENTION

This portion of the appeal raises three issues. First, was Trooper Helton's request that Carlson be seated in the front of the patrol cruiser during the computer check reasonable? Second, was Trooper Helton's questioning of Carlson, both before and after she was seated in the patrol cruiser, reasonable? Third, was the overall duration of the stop reasonable? We will address each of these issues separately.

### (1) Placement in the patrol cruiser

In *State v. Evans* (1993), 67 Ohio St.3d 405, 407–408, 618 N.E.2d 162, 165–166, the Ohio Supreme Court adopted the holding in *Pennsylvania v. Mimms* (1977), 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331. In *Mimms*, the U.S. Supreme Court held that a police officer may order a motorist to get out of a lawfully stopped

---

3. Accord *State v. Palicki* (1994), 97 Ohio App.3d 175, 180–181, 646 N.E.2d 494, 497–499; *State v. Riley* (1993), 88 Ohio App.3d 468, 475–476, 624 N.E.2d 302, 306–308; *Bloomfield*, 40 F.3d at 915; *United States v. Seals* (C.A.5, 1993), 987 F.2d 1102, 1106.

vehicle, even if the officer is unable to articulate a reasonable suspicion to justify this action. Thus, unlike the initial stop of a motorist, where the officer must be able to point to specific and articulable facts to support the intrusion, "a *Mimms* order does not have to be justified by any constitutional quantum of suspicion." *Evans* at 408, 618 N.E.2d at 166.

In adopting *Mimms,* the Ohio Supreme Court noted that "[o]ther courts have relied on *Mimms* in holding constitutional a police officer's *additional* order that the driver be seated in the patrol car. See *State v. Mertz* (N.D.1985), 362 N.W.2d 410, 413[.]" (Emphasis *sic.*) *Evans,* 67 Ohio St.3d at 408, 618 N.E.2d at 165. Although the Supreme Court cited the *Mertz* holding, that holding was not directly relevant to the disposition of Evans's appeal. Instead, because Evans failed to produce a driver's license after being lawfully stopped, the court found that the officers were statutorily authorized to arrest Evans and, therefore, were justified in placing him in the back seat of the patrol car. *Id.* at 409, fn. 1, 618 N.E.2d at 166, fn. 1. The court further found that once the officers had a legitimate reason to detain Evans in the back seat of the patrol car, they could conduct a brief pat-down search to guard against "an ambush from the rear." *Id.* at 410, 618 N.E.2d at 167.

In the present appeal, Trooper Helton testified that when he approached Carlson's pickup, Carlson produced a driver's license and vehicle registration. Trooper Helton also testified that he did not fear for his safety during the stop. Nevertheless, Trooper Helton requested that Carlson be seated in the front seat of his cruiser while he ran the computer check on her New Hampshire license. Carlson argues that by asking her to be seated in the front of the patrol cruiser, Trooper Helton went beyond the permissible scope of a *Terry* stop. Apparently, the trial court agreed with Carlson, finding that "[t]o keep the Defendant in a police cruiser, and to engage in the questioning of her goes beyond the scope of a *Terry* [stop]."

Several federal courts have suggested that under *Terry,* an officer generally must have a reasonable justification, based on specific and articulable safety concerns, before asking a detained motorist to sit in the patrol car. See, *e.g., United States v. Cannon* (C.A.9, 1994), 29 F.3d 472, 476–477; *United States v. Ricardo D.* (C.A.9, 1990), 912 F.2d 337, 341. However, even these courts have recognized that safety concerns are not the only valid basis for asking a detained motorist to sit in the patrol car. As stated by the court in *Ricardo D.,* an officer may ask a detained motorist to sit in the patrol car when the officer has "some reasonable justification [based on safety concerns] or when the detention is * * * a brief procedure employed in a routine traffic stop." 912 F.2d at 341. Thus, if an officer's request is "merely a normal part of traffic police procedure for identifying delinquent drivers," the minimal intrusion of being detained in the

patrol car is within the permissible scope of a *Terry* stop and does not violate the Fourth Amendment. *United States v. Rodriguez* (C.A.7, 1987), 831 F.2d 162, 166; *United States v. Rivera* (C.A.7, 1990), 906 F.2d 319, 322 (asking a detained motorist to sit in the patrol car while the officer writes a traffic warning is within constitutional norms); *Bloomfield,* 40 F.3d at 915 (a reasonable investigation includes requesting that the driver sit in the patrol car).

■ We find the latter cases to be persuasive. Therefore, we hold that in the context of a routine traffic stop, a police officer may ask a detained motorist to sit in the front seat of the patrol car without violating the Fourth Amendment if the motorist's detention in the front seat is employed merely as a brief procedure to facilitate the traffic stop. See *Shook* at 6–7. In this case, Trooper Helton asked Carlson to accompany him to his patrol cruiser so he could "write up the written warning and also run a check on her New Hampshire driver's license." Carlson complied and sat in the front seat. Under these circumstances, Carlson's detention in the front seat was nothing more than a brief procedure employed by Trooper Helton to aid in writing the traffic warning and assist in verifying Carlson's compliance with state licensing laws. This minimal intrusion was within the scope of the *Terry* stop and did not violate Carlson's Fourth Amendment rights.

### (2) Scope of the questioning

The trial court found that Trooper Helton "went beyond the bounds of legal inquiry when he inquired about the travels of the Defendant." The court further opined that:

"Making a traffic stop for speed should not justify inquiry about where the [motorist] is going or from whence he/she came, or how long it took to get there. Nor is it legitimate to inquire as to the whereabouts of the Defendant's boyfriend. Obviously, the more questions that are asked, the more there might be to bolster probable cause or even articulable suspicion."

As part of its reasoning, the trial court cited *State v. Retherford* (1994), 93 Ohio App.3d 586, 639 N.E.2d 498, a decision from Ohio's Second District Court of Appeals.

From our understanding of the trial court's order, the court determined that Trooper Helton's questions concerning Carlson's travel plans and the location of her boyfriend were "clearly not the stuff of casual conversation but were in the manner of an investigation, *i.e.,* an attempt to verify or dispel his inarticulate suspicions about [Carlson]." *Retherford,* 93 Ohio App.3d at 600, 639 N.E.2d at 508. Stated another way, the trial court determined that Trooper Helton's questions were not reasonably related to the scope of the traffic stop but, instead,

were used to further a separate, impermissible investigation based on Trooper Helton's inarticulable hunch that Carlson was engaged in drug-related activity. We do not agree with the trial court.

In *Berkemer v. McCarty* (1984), 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317, the United States Supreme Court was confronted with the argument that the roadside questioning of a detained motorist should be considered "custodial interrogation" and, therefore, is subjected to Fifth Amendment *Miranda* requirements. In rejecting this argument, the court recognized that the "detention of a motorist pursuant to a traffic stop is presumptively temporary and brief" and that the "motorist's expectations * * * are that he will be obliged to spend a short period of time answering questions and waiting while the officer checks his license and registration." 468 U.S. at 437, 104 S.Ct. at 3149, 82 L.Ed.2d at 333. Furthermore, even though an officer may ask routine questions, a detained motorist "is not obliged to respond" and typically does not feel "completely at the mercy of the police." 468 U.S. at 438, 104 S.Ct. at 3149, 82 L.Ed.2d at 333–334. Thus, given the "nonthreatening character of detentions of this sort," the *Berkemer* court concluded that a detained motorist is not "in custody" for purposes of the Fifth Amendment, so routine police questioning during a traffic stop is not subject to the dictates of *Miranda.* 468 U.S. at 440, 104 S.Ct. at 3150, 82 L.Ed.2d at 334.

■ In light of *Berkemer*, it is clear that an officer may engage in routine questioning of a detained motorist during the pendency of a traffic stop without violating the Fifth Amendment. Since the nature of this type of intrusion is so minimal, we can find no reason why such routine questioning would be violative of the Fourth Amendment.

As a general rule, "mere police questioning does not constitute a seizure." *Florida v. Bostick* (1991), 501 U.S. 429, 434, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389, 398. At least one federal circuit has relied on this rule to conclude that "a police officer's questioning, even on a subject unrelated to the purpose of the [traffic] stop, is [not] itself a Fourth Amendment violation." *Roberson,* 6 F.3d at 1092, quoting *United States v. Shabazz* (C.A.5, 1993), 993 F.2d 431, 436. Given the facts in this case, we presently do not need to consider the merits of such a broad statement of the law. Rather, because Trooper Helton's questions were "reasonably related in scope to the circumstances which justified the [stop]," no violation of the Fourth Amendment can be found. *Terry,* 392 U.S. at 19, 88 S.Ct. at 1879, 20 L.Ed.2d at 905.

■ Trooper Helton testified that while Carlson was still in her pickup, he asked her about "who owned the vehicle" and "how long she had been on the road." In response, Carlson produced a California vehicle registration in the

name of Michael Laser and stated that Laser was her boyfriend. Carlson elaborated that she had borrowed her boyfriend's pickup to return to New Hampshire and that she had been on the road for less than three days. While they were sitting in the patrol cruiser during the computer check on Carlson's New Hampshire license, Trooper Helton inquired further into Carlson's travel plans. He asked her why she had left California and why her boyfriend had not accompanied her on the trip. According to Trooper Helton's testimony, Carlson first said she was moving from California and then later said she had been on a two-week vacation in California. Carlson was also unsure of whether her boyfriend was currently in California or New Hampshire.

In *Michigan Dept. of State Police v. Sitz* (1990), 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412, the court held that "the initial stop of [a] motorist passing through a [sobriety] checkpoint and the *associated preliminary questioning* and observation by checkpoint officers" is a slight and minimal intrusion that does not violate the Fourth Amendment. (Emphasis added.) *Id.* at 450–451, 110 S.Ct. at 2485, 110 L.Ed.2d at 420–421. Considering the innocuous nature of Trooper Helton's questions about Carlson's travel plans, we believe those questions were no more intrusive than the type of preliminary questioning generally associated with a sobriety checkpoint. Furthermore, having been given a vehicle registration listing an owner and a state different from that of Carlson's driver's license, it was reasonable for Trooper Helton to ask questions about the registered owner to verify whether Carlson had permission to use the vehicle. Under the totality of the circumstances, therefore, Trooper Helton's questions did not go beyond the scope of the traffic stop. Cf. *Shabazz*, 993 F.2d at 437 ("While [motorists are] under no obligation to answer questions, the Constitution does not forbid law enforcement officers from asking.").

### (3) Overall duration of the stop

An investigative stop may last no longer than is necessary to effectuate the purpose of the stop. *Florida v. Royer* (1983), 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229, 238; *State v. Bevan* (1992), 80 Ohio App.3d 126, 129, 608 N.E.2d 1099, 1100–1101. In conducting an investigative stop for a traffic violation, an officer may detain a motorist for a period of time sufficient enough to issue a warning or citation. *Shook* at 8, citing *State v. Keathley* (1988), 55 Ohio App.3d 130, 131–132, 562 N.E.2d 932, 933–934. An officer may also run a computer check on the detained motorist's license, registration, and vehicle plates to ascertain compliance with state law. See *Prouse*, 440 U.S. at 657–658, 59 L.Ed.2d at 670–671. In determining if an officer completed these tasks within a reasonable length of time, the court must evaluate the duration of the stop in light of the totality of the circumstances and consider whether the officer diligently conducted the investigation. See *State v. Cook* (1992), 65 Ohio St.3d

516, 521–522, 605 N.E.2d 70, 78–79 (fifteen-minute detention reasonable); *United States v. Sharpe* (1985), 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (twenty-minute detention reasonable).

Trooper Helton stopped Carlson at 1:25 p.m. Four minutes later, at 1:29 p.m., Trooper Helton radioed Carlson's driver's license number to dispatch for a computer check on its validity. Several minutes after the initial request, dispatch advised him that "there was nothing coming back from New Hampshire" by license number and asked whether he wanted to run the license by name and date of birth. Trooper Helton responded yes. At that point, Trooper Burns arrived at the scene and walked Rex around Carlson's pickup. According to the testimony, Rex alerted to the odor of drugs approximately nineteen minutes after Carlson was stopped. At the time of Rex's alert, Trooper Helton was still waiting for the results of the computer check on Carlson's license.

Under the totality of these circumstances, we find that Trooper Helton diligently conducted his traffic investigation. Trooper Helton promptly radioed Carlson's license information to dispatch and began writing the traffic warning. Upon an inconclusive response from her license number, Trooper Helton diligently pursued a computer check using Carlson's name and date of birth. Trooper Helton testified that the typical traffic stop lasts "anywhere from ten to twenty minutes," depending on how quickly the computer processes the motorist's license and/or registration information. When Rex alerted to the drug odor from Carlson's pickup, only nineteen minutes had elapsed since the beginning of the stop and Trooper Helton was still waiting for the results of the computer check on Carlson's out-of-state license. Taking all these facts together, Trooper Helton pursued his investigation in a diligent and reasonable manner, and nothing suggests that Carlson was unreasonably or unnecessarily delayed.

Therefore, because Trooper Helton was lawfully detaining Carlson for the speeding violation when Trooper Burns conducted the dog sniff, the trial court erred in finding that the troopers exceeded the scope of the initial traffic stop.[4]

### D. DOG SNIFF (PROBABLE CAUSE)

The last issue is whether Rex's alert to the odor of drugs constituted probable cause to search Carlson's pickup. Although the trial court found that "once a drug dog alerts there is at least articulable suspicion for a search," the court

---

4. The trial court also found that Trooper Helton's observations concerning drug courier "indicators" were insufficient to create a reasonable suspicion of drug-related activity that would have justified detaining Carlson beyond the duration of the initial traffic stop. Because we have determined that the dog sniff was conducted during the permissible duration of the initial traffic stop, we do not need to address whether Trooper Helton's observations would have permitted a longer detention and a broader investigation into drug-related activity.

suggested that a dog alert, by itself, does not constitute probable cause to search a detained vehicle. In this regard, the trial court opined that:

"[D]ogs alert to smells that remain for quite a time and may falsely alert. That is, the dog may be alerting to something that had been in the vehicle several days previously. Since police officers obtaining a warrant to search are required to have up-to-date information, and cannot obtain a warrant based on stale information, it is perhaps unjustified to allow a search based on what may be stale smells."

Carlson asks this court to adopt both the reasonable suspicion standard and the "stale odor" reasoning suggested by the trial court. We decline.

In *Shook,* this court held that once a trained drug dog alerts to the odor of drugs from a lawfully detained vehicle, an officer has probable cause to search the vehicle for contraband. *Id.* at 10, citing *United States v. Ludwig* (C.A.10, 1993), 10 F.3d 1523, 1527–1528.[5] We find no reason to alter this holding.

Probable cause means that "there is a *fair probability* that contraband or evidence of a crime will be found in a particular place." (Emphasis added.) *Illinois v. Gates* (1983), 462 U.S. 213, 214, 103 S.Ct. 2317, 2320, 76 L.Ed.2d 527, 548. Relying on this statement of the law, the court in *Ludwig* concluded that "a dog alert usually is at least as reliable as many other sources of probable cause and is certainly reliable enough to create a 'fair probability' that there is contraband." 10 F.3d at 1527. Likewise, in *United States v. Johnson* (C.A.2, 1981), 660 F.2d 21, 22–23, the court concluded that:

"[A]ppellant's argument with respect to the problem of a dog detecting only the residual odors as opposed to the drugs themselves misconstrues the probable cause requirement. Absolute certainty is not required by the Fourth Amendment. What is required is a reasonable belief that a crime has been or is being committed."

We agree with the foregoing reasoning and therefore reaffirm our holding that once a trained drug dog alerts to the odor of drugs from a lawfully detained vehicle, an officer has probable cause to search the vehicle for contraband.[6]

As to the "stale odor" argument, we find it fanciful but unpersuasive. Under the staleness doctrine, "staleness is not measured merely on the basis of

---

5. Accord *Palicki,* 97 Ohio App.3d at 181, 646 N.E.2d at 498–499; *Bloomfield,* 40 F.3d at 919; *Jeffus,* 22 F.3d at 557; *United States v. Dovali–Avila* (C.A.5, 1990), 895 F.2d 206, 207.

6. In *Ludwig,* the court hinted that "[a] dog alert might not give probable cause if the particular dog had a poor accuracy record." 10 F.3d at 1528. Carlson did not directly challenge Rex's accuracy in this court, so we express no opinion on the issue. For a case addressing such a challenge, however, see *United States v. Diaz* (C.A.6, 1994), 25 F.3d 392.

the maturity of the information." *United States v. Bucuvalas* (C.A.1, 1992), 970 F.2d 937, 940. Consequently, "there is no arbitrary time limit on how old information [supporting probable cause] can be." *State v. Jones* (1991), 72 Ohio App.3d 522, 526, 595 N.E.2d 485, 488. Rather, the test for staleness is whether the available information justifies a conclusion that contraband is *probably* on the person or premises to be searched. *Id.; State v. Yanowitz* (1980), 67 Ohio App.2d 141, 147, 21 O.O.3d 445, 449, 426 N.E.2d 190, 195. The test for staleness is clearly no different than the "fair probability" test used by the court in *Ludwig*. As a result, an argument based on staleness adds nothing new to the inquiry and must be rejected.

Finally, Carlson argues that the dog sniff of the interior of the enclosed bed-cap was not supported by probable cause. During the exterior sniff of the pickup, Rex alerted to the odor of drugs by scratching and biting on the passenger side of the truck near the cab and near the front of the enclosed bed-cap. Upon searching the cab of the pickup, the troopers did not discover any drugs but found cigarette rolling papers and a package of metal screens. After opening the locked bed-cap, Trooper Burns retrieved Rex and directed him into the truck bed. Rex alerted to a drug odor from one of the duffel bags, which contained a one-hundred-seven-pound bale of marijuana.

Carlson contends that Rex's alert on the exterior of the pickup was a dead or false alert because the troopers did not discover any drugs in the cab; thus, Carlson argues that having failed to discover any drugs in the cab, the troopers did not have probable cause to open the enclosed bed-cap and conduct an interior dog sniff of that part of the pickup.

One federal court has suggested that the search of a vehicle following a dog alert is limited to the general area where the dog actually alerted. *Seals*, 987 F.2d at 1106–1107 and fn. 8. Assuming *arguendo* the validity of this approach, opening the enclosed bed-cap and conducting an interior dog sniff of that area did not exceed the scope of Rex's exterior alert. Rex alerted by scratching and biting on the passenger side of the truck near the cab *and* near the front of the enclosed bed-cap. Therefore, even if the troopers were restricted to searching the general area where Rex alerted, that area would have necessarily included both the cab and the enclosed bed-cap.

Even more compelling, however, is the holding in *Palicki*. In that case, Ohio's Sixth District Court of Appeals concluded that a drug dog's alert on the exterior of a vehicle provides probable cause to conduct a dog sniff of the vehicle's interior and its contents. 97 Ohio App.3d at 181, 646 N.E.2d at 498–499. Accord *United States v. Sukiz–Grado* (C.A.10, 1994), 22 F.3d 1006, 1009. We agree with the *Palicki* holding and adopt it as the holding of this court. Accordingly, once

Rex alerted on the exterior of Carlson's pickup, the troopers had probable cause to conduct a dog sniff of the interior of the pickup and its contents.

## E. CONCLUSION

Based on the foregoing, the state's assignments of error are sustained. The trial court's order granting Carlson's motion to suppress is reversed, and the case is remanded for further proceedings.

*Judgment reversed*
*and cause remanded.*

BAIRD, P.J., and QUILLIN, J., concur.