OPINION AND JUDGMENT ENTRY
This is an appeal brought by the state of Ohio ("appellant") to challenge the September 30, 1998 judgment of the Wood County Court of Common Pleas granting a motion to suppress filed by appellee, Arthur E. Green, Jr.
Appellant has presented one assignment of error for review that is:
 "THE TRIAL COURT ERRED IN GRANTING APPELLEE'S MOTION TO SUPPRESS BECAUSE PROBABLE CAUSE WAS ESTABLISHED WITHIN A REASONABLE LENGTH OF TIME AND APPELLEE WAS DETAINED ON A REASONABLE BASIS."
As this court has previously said:
 "An appellate court reviews whether substantial evidence supports a trial court's decision on a motion to suppress. Maumee v. Johnson
(1993), 90 Ohio App.3d 169, 171. The trial court acts as the trier of fact and is in the best position to resolve questions of fact and determine witness credibility. State v. Johnston
(1993), 85 Ohio App.3d 475, 477. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. State v. Guysinger (1993), 86 Ohio App.3d 592, 594." State v. Jenkins (Mar. 31, 1998), Lucas App. No. L-97-1303, unreported.
At the same time, this court will independently decide questions of law. State v. Vorous (Feb. 22, 1994), Stark App. No. CA-9414, unreported. Keeping this standard of review in mind, we now consider the record and the arguments presented by the parties on appeal.
The record shows that on May 20, 1998, the grand jury sitting in Wood County, Ohio, filed an indictment against appellee charging him with knowingly obtaining, possessing or using more than two hundred grams but not more than one thousand grams of marijuana, a controlled substance, in violation of R.C.2925.11(A). Appellant filed a motion to suppress, and a hearing was held by the trial court.
At the hearing, the only witness to testify was State Trooper Romero who stopped appellee and eventually arrested him. Trooper Romero testified that on April 8, 1998, while he was on duty, he received a report on his radio from another state trooper that a vehicle was headed his way with tinted windows that were so dark they were in violation of state regulations. The trooper stopped appellee's vehicle after he received the report. He testified that at the time of the stop, his intent was to cite appellee for operating a vehicle with excessive window tint.
He asked appellee to get out of his own vehicle and to sit in the police cruiser with the trooper while the trooper ran a check on appellee's driver's license and registration. The trooper testified that appellee complied with his request, and that the officer entered appellee's social security number on his mobile data terminal computer in his cruiser. He said he got back a report that a felony warrant for child endangering was outstanding against an individual who listed appellee's name as an alias.
Trooper Romero then contacted one of his partners over the radio to ask the partner to come to the scene and to help him confirm the warrant. Trooper Romero testified that the physical description of the person wanted in the felony warrant differed somewhat from the physical appearance of appellee. For instance, the person wanted in the warrant was listed as six foot tall, weighing two hundred fifteen pounds, with black hair and brown eyes. Appellee is five foot eleven inches tall, weighs one hundred fifty-five pounds and has black hair and brown eyes. The following exchange then took place between the prosecutor and the trooper:
"Q Did you assess that information?
 "A Yes, I did. And I considered disregarding on calling Trooper Barinowski, but remembered he had the telephone in the car, a State Highway Patrol-issued telephone that he could utilize calling the jail and perhaps confirming or dispelling the warrant, photographs or mug shot with the individual that was wanted.
"Q What did you do?
 "A I went ahead — I had told Trooper Barinowski. Then I reconsidered and told him to go ahead and meet me here. At the same time Trooper Barinowski was going to be on the way, I called Trooper Courtney to walk a K-9 unit around the car while I was confirming the warrant.
 "Q While waiting for Trooper Barinowski and Trooper Courtney, did you do anything else to investigate the identity of the Defendant?
 "A I asked the suspect — or I told the suspect that there was a warrant for a person matching his name, and asked him if he knew anything about that. He stated that he did not. He had recalled that there had been an incident in the past where an individual had used his name, I think he stated that it was an ex-classmate or ex-schoolmate that he knew that was using his name and was getting in trouble; and subsequently Mr. Green was, I don't know if he'd ever been arrested before for prior warrant, but he knew about this individual using his name."
Trooper Romero testified that Trooper Barinowski arrived one to two minutes from the time he called for back-up and Trooper Courtney arrived with the drug sniffing dog within five minutes from the time he was called. Trooper Barinowski ran a check of appellee's social security number and got the same information Trooper Romero had received. The troopers then called the Lucas County Jail by telephone and asked for a mug shot of the person named in the felony warrant. While they were waiting for the jail to call them back, Trooper Courtney walked his dog around appellee's vehicle. The dog alerted, indicating it smelled drugs. Trooper Romero testified that the dog alert took place approximately nine or ten minutes after he stopped appellee. Approximately thirty minutes to an hour after the dog alerted to appellee's vehicle, the troopers received information from the Lucas County Jail that confirmed appellee was not the person named in the felony warrant.
The prosecutor asked Trooper Romero: "Barring any difficulties, any positive warrants, or any positive hits when you run a person through your computer, approximately how long from the stop to issuing the citation does it take?" Trooper Romero answered: "Approximately twelve to fourteen minutes."
On cross-examination, Trooper Romero admitted that he did not think appellee weighed two hundred fifteen pounds at the time of the stop. He conceded that there was a sixty pound difference in the description of the person named in the felony warrant and in appellee's physical appearance. He also admitted that the physical description on the felony warrant was entered five days before he stopped appellee. Finally, he admitted that he did not begin writing a citation for the window tint violation until appellee was booked at the Wood County Jail.
The record shows that appellant was found guilty of the window tint violation in the Bowling Green Municipal Court. The transcript from that trial was admitted as an exhibit in this case. The transcript shows that Trooper Romero testified that he did not perform tests on appellee's vehicle windows to verify the tinting was in violation of Ohio regulations until after the dog had alerted. Trooper Romero testified that he could not recall for certain when he did the tinting tests, but he believed it was after appellant was arrested on the drug charge and was at the Wood County Jail.
In its September 30, 1998 judgment entry, the trial court made three "factual" findings:
 "1. The State Trooper made a legal stop of the Defendant for having tinted windows, which were too dark.
 "2. The State Trooper received communications there was an outstanding warrant for a person with an alias of William Green for child neglect. This warrant was not for the Defendant. At the request of the first trooper, two other troopers arrived, one with a drug dog.
 "3. There was no evidence that there was probable cause to believe the Defendant was violating the drug laws except for the trooper not immediately issuing the Defendant a summons and calling for the drug dog."
The trial court then made the following rulings:
 "The Defendant should have received a citation for a minor misdemeanor under 2935.26(a). No arrest should have taken place.
 "Further, there was no probable cause to believe that the Defendant was violating the drug laws except following the illegal arrest."
In support of its sole assignment of error, appellant argues that the initial stop of appellee was constitutionally permissible. Appellant further argues that appellee failed to show that he was detained for an unreasonable length of time following the stop. Finally, appellant argues that because a dog sniff is not a search, appellant was not required to show the officer who stopped appellee had either reasonable suspicion or probable cause to support his decision to call for the canine unit.
Appellee responds that Trooper Romero's "investigative measures in this case were unreasonable when viewed in the totality of circumstances." Appellee argues that the trial court correctly concluded that under the facts in this case, no reasonable person would believe that appellee was the person wanted in the felony warrant. Appellee argues that "the investigation should have terminated when the trooper decided to issue the minor misdemeanor citation [for excessive window tinting]." Appellee says the trooper's further investigation, "including calling for back up and a dog, at that point, is tantamount to a fishing expedition for further crimes." Appellee concludes that Ohio courts have consistently held that police officers cannot extend legitimate traffic stops into "fishing expeditions" and that the trial court correctly granted his motion to suppress in this case.
This court has previously said:
 "[W]here there is a reasonable and articulable suspicion to believe that a motor vehicle or its occupants are in violation of the law, stopping the vehicle and detaining its occupants will not violate the Constitution. Delaware v. Prouse (1979), 440 U.S. 648, 663, 59 L.Ed.2d 660, 99 S.Ct. 1391. In conducting an investigative traffic stop, an officer may detain a motorist for a period of time sufficient to run a computer check on his license, registration, and vehicle plates and to issue him a warning or a citation. Id.
at 659. See, also, State v. Carlson (1995), 102 Ohio App.3d 585, 657 N.E.2d 591; State v. Anderson (Dec. 13, 1995), 1995 Ohio App. LEXIS 5480, Lorain App. No. 95CA006052, unreported; State v. Shook
(June 15, 1994), 1994 Ohio App. LEXIS 2631, Lorain App. No. 93CA005716, unreported.
 "However, the `lawfulness of the initial stop will not support a `fishing expedition' for evidence of crime.' State v. Smotherman (July 29, 1994), 1994 Ohio App. LEXIS 3302, Wood App. No. 93WD082, unreported, citing State v. Bevan (1992), 80 Ohio App.3d 126, 130, 608 N.E.2d 1099. Depending on the facts of each individual case, certain police activities have been deemed to be manipulative practices which were beyond the scope and purpose for which the initial stop was made. For example, it has been determined that, in certain instances, following a script, prolonging a traffic stop in order to `fish' for evidence, separating an individual from his car and engaging in `casual conversation' in order to observe `body language' and `nervousness' may be manipulative practices and, therefore, well beyond the scope of the initial purpose for the stop. See State v. Chatton (1984), 11 Ohio St.3d 59, 63, 463 N.E.2d 1237; State v. Correa (1995), 108 Ohio App.3d 362, 367-368, 670 N.E.2d 1035; State v. Gonyou (1995), 108 Ohio App.3d 369, 372; State v. Smotherman, supra. Whether or not a detention was reasonable depends upon the totality of the circumstances and the facts of each case. See State v. Bobo (1988), 37 Ohio St.3d 177, 178, 524 N.E.2d 489.
"* * *
 "If a vehicle is lawfully detained, the exterior `sniff' by a trained narcotics dog to detect the odor of drugs is not a search within the meaning of the Fourth Amendment to the United States Constitution. State v. Carlson (1995), 102 Ohio App.3d 585, 594, 657 N.E.2d 591; State v. Riley (1993), 88 Ohio App.3d 468, 476, 624 N.E.2d 302. See, also, United States v. Place (1983), 462 U.S. 696, 77 L.Ed.2d 110, 103 S.Ct. 2637. Ohio courts have held that police need not have a reasonable suspicion of drug-related activity prior to subjecting an otherwise lawfully detained vehicle to a canine sniff. See State v. Carlson, supra; State v. Anderson (Dec. 13, 1995), 1995 Ohio App. LEXIS 5480, Lorain App. No. 95CA006052, unreported; State v. Johnson (Sept. 29, 1995), 1995 Ohio App. LEXIS 4336, Seneca App. No. 13-95-30, unreported; State v. Poole (June 7, 1995), 1995 Ohio App. LEXIS 2459, Medina App. No. 2336-M, unreported; State v. Ballard (Feb. 16, 1994), 1994 Ohio App. LEXIS 627, Auglaize App. No. 2-93-12, unreported, affirmed at 71 Ohio St.3d 394, 643 N.E.2d 1147.
"* * *
 "[P]urely manipulative police procedures must not be tolerated. However, when a vehicle is lawfully detained, police officers must be permitted to perform routine procedures. These include the check of drivers' licenses and registrations. The use of a narcotics dog for a simple `walk around' of a vehicle may under certain circumstances be part of those procedures. However, in order to determine whether or not a continued detention is reasonable and justified, the facts of each case must be individually evaluated based upon a totality of the circumstances test." State v. Rusnak
(1997), 120 Ohio App.3d 24, 27-29.
Furthermore, as the Twelfth District Court of Appeals has noted:
 "[I]f a police officer, during the initial detention of a motorist, ascertains additional specific and articulable facts which give rise to a reasonable suspicion of criminal activity beyond that which prompted the stop, the officer may further detain the motorist and conduct a more in-depth investigation."
State v. Griffith (Aug. 10, 1998), Madison App. No. CA97-09-044, unreported (citing State v. Robinette (1997), 80 Ohio St.3d 234,241).
In this case appellee does not dispute the trial court's ruling that the initial stop was constitutionally sound. The issue that remains, therefore, is whether the trial court was correct when it ruled that appellee's arrest was illegal, thereby indicating its conclusion that at the time the dog sniffed appellee's vehicle, appellee was under an illegal detention. After viewing the totality of the circumstances in this case, we find that the trial court erred when it concluded as a matter of law, that appellee was illegally detained at the time of the dog sniff.
Trooper Romero's testimony shows that when the dog sniff was conducted in this case, he was still in the process of investigating information he learned while running a check on appellee's driver's license and registration and he had not yet issued appellee a warning or a citation for the traffic offense of excessive window tinting. He testified that it would ordinarily take him twelve to fourteen minutes to write a citation for a window tinting violation, and that the dog sniff took place within ten minutes of the initial stop of appellee. Other Ohio courts have considered it significant that a citation for a legitimate stop was actively being investigated or written when a dog sniff was conducted, and that the length of time an individual was detained for that purpose before a dog sniff led to probable cause to believe a drug offense was committed was short. See, e.g.,State v. Rusnak, 120 Ohio App.3d 24, 29; State v. Carlson (1995),102 Ohio App.3d 585, 599; State v. Bradford
(July 8, 1998), Medina App. No. 2752-M, unreported; State v.Anderson (Dec. 13, 1995), Lorain App. No. 95CA006052, unreported;State v. Poole (Jun. 7, 1995), Medina App. No. 2336-M, unreported; State v. Shook (Jun. 15, 1994), Lorain App. No. 93CA005716, unreported. Accordingly, we find that the trial court erred as a matter of law when it granted appellee's motion to suppress. Appellant's sole assignment of error is well-taken.
The judgment of the Wood County Court of Common Pleas is reversed and remanded to the trial court for further proceedings consistent with this opinion. Appellee is ordered to pay the court costs of this appeal.
JUDGMENT REVERSED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Peter M. Handwork, P.J., JUDGE
Melvin L. Resnick, J., JUDGE
Richard W. Knepper, J., JUDGE
CONCUR.