OPINION
Pursuant to Crim.R.12(J), the State appeals the trial court's grant of Defendant-Appellee Stephen M. Keller's motion to suppress evidence obtained after Keller was detained for purposes of issuing him a traffic citation. The State contends the trial court erred in finding the traffic stop itself and the subsequent search of Keller's rented automobile illegal. For the reasons that follow, we reluctantly agree with the State.
At the suppression hearing, Lieutenant Shaun Smart and Trooper Charles Wright testified and related the following sequence of events which occurred on May 27, 1999. In the daylight hours of that morning, at approximately 11:30a.m., Lieutenant Smart was on routine patrol on Interstate 70 between Dayton and the Indiana border, and was observing traffic on the highway from a vantage point in the center median between the eastbound and westbound traffic. He noticed an eastbound U-Haul truck that appeared not to have a front license plate displayed, so he pulled out of the median strip and proceeded to catch up with the U-Haul. Smart also took note of the fact that there was a tractor trailer rig in front of the U-Haul, which was itself followed by a red car later determined to have been driven by Keller. For no particular reason, Smart decided to do a computer registration check on the red car, and entered its license plate number in the computer. Smart continued on, caught up with the U-Haul truck, and noticed that it did indeed have properly displayed license plates both fore and aft. Nevertheless, he entered the U-Haul truck's license plate in the on-board computer as well. Smart testified that it is his practice to pull to the side of the road while waiting for the computer to perform the registration checks, and he did so in this instance. Within a short period of time, the information came back indicating both vehicles were rentals and were properly registered.
As Smart proceeded eastbound on the interstate and caught up to the red car again, he noticed that the U-Haul truck had passed the tractor trailer, and that Keller was driving at a rate of about 55-57 miles per hour behind the tractor trailer. Smart testified that this, in conjunction with Keller's placement of both hands on the steering wheel and unwavering attention to the road caused him to be very suspicious. After his suspicions were aroused, Smart testified that he observed Keller following the tractor trailer too closely; specifically, Smart stated there was no more than one or two car lengths between the back of the tractor trailer and the front of the red car. He decided to "pace" the red car rather than pull it over immediately, however.
For approximately two miles, Smart followed Keller, who continued at a speed of about 55-57 miles per hour. During the time he was "pacing" Keller, Smart testified that he saw the U-Haul truck, which was approximately one half mile ahead and in front of the tractor trailer on a stretch of highway Smart described as straight, travel onto the shoulder of the highway by several tire widths. Smart decided to stop both the U-Haul for failing to stay within the painted lane lines, and Keller for following the tractor trailer too closely. His plan was to pull the U-Haul over first, and have his partner flag down Keller's car as it went past the U-Haul. As Smart passed the tractor trailer rig, however, Keller exited the interstate. Abandoning his plan to pull over both vehicles, Smart made a u-turn in the center median, drove westbound on the highway to the exit, and located Keller's car at a nearby Speedway gas station where Keller was filling the tank of the red car. From what we are able to discern from the record, Smart requested a that a canine unit be dispatched to the Speedway station before exiting his cruiser, and such was done at 11:35a.m.
Lieutenant Smart approached Keller on foot after parking his cruiser, and explained that he had followed Keller off the highway because Keller had been following the tractor trailer too closely. By that time, Keller had begun washing the windows of his car and he continued to do so as he acknowledged Smart's presence, conduct Smart considered "not normal." Although hesitantly, Keller provided Smart with his driver's license and rental contract for the car and answered Smart's questions concerning the point of origin of his trip and his eventual destination. Keller replied that he was coming from San Antonio, Texas, but the rental contract indicated the car Keller was driving had been rented in El Paso, which Smart knew to be a major distribution point for illegal narcotics. Smart noticed that unlike the typical subject of a traffic stop, Keller appeared to be getting progressively more nervous rather than less so. Smart told Keller he could go in and pay for his gasoline and asked him to move his car away from the pumps and over by the cruiser, which Keller did while Smart entered Keller's driver's license number in the KDT computer.
After Keller moved his car, Smart performed a pat-down search of Keller for weapons. None were found and Smart placed Keller in his cruiser and questioned him again about his point of origin as he waited for the KDT computer to respond to his request for information. At 11:49a.m., Trooper Charles Wright and his drug-sniffing dog, Britt, arrived at the scene. Britt was led around Keller's car twice and he alerted at two spots, the first being near the gas tank and the second time near the right rear passenger door. Shortly thereafter, Smart received the information he had requested from the KDT computer. Keller's car was searched, duffel bags containing ninety pounds of marijuana were found in the back seat, and Keller was arrested for possession of marijuana in violation of R.C. § 2925.11(A), and cited for following the tractor trailer too closely in violation of R.C. § 4511.34.
On June 29, 1999, Keller filed a motion to suppress all evidence and statements made by him on grounds that the initial stop was illegal because it was a pretext, and that the search of his vehicle was illegal since it was performed without a warrant and none of the exceptions to the warrant requirement were applicable. The State responded with a peculiar "List of Citations" (containing the names of thirteen cases, only two of which were properly cited, and most of which included no citation at all!), but presented no argument opposing Keller's motion to suppress. The trial court's decision, order, and entry sustaining Keller's motion to suppress, wherein the court found both the initial stop and the subsequent search of Keller's vehicle to be illegal, was rendered on July 29, 1999, and the State's timely appeal followed.
The State asserts one assignment of error set forth as follows:
 The trial court erred in granting Defendant's motion to suppress evidence seized when Defendant was stopped for violating a traffic law, when that stop was not unreasonably long in duration, and when the subsequent search of his vehicle was based upon probable cause to believe that the Defendant was transporting illegal narcotics.
Although framed in one assignment of error, the State actually presents three arguments. First, it claims that the trial court erred in finding the initial stop of Keller to be illegal. Second, the State argues that Smart's detention of Keller was not of an unreasonable duration. Finally, the State contends the subsequent search of Keller's car was also legal since it was based on probable cause to believe he was engaged in criminal activity.
Preliminarily, we note that "[w]hen considering a motion to suppress, the trial court assumes the role of the trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of the witnesses." State v. Clary
(Sept. 30, 1996), Lawrence App. No. 96CA7, unreported, citingState v. Mills (1992), 62 Ohio St.3d 357, 366. Thus, "in its review, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence."Clary, supra, citing State v. Guysinger (1993), 86 Ohio App.3d 592,594. The appellate court reviews de novo whether the trial court's conclusions of law based on those findings of fact are correct, however. Guysinger, supra at 594. We now turn to the merits of the State's assignment of error with these principles in mind.
We first consider whether Lieutenant Smart's stop of Keller was legal. The State argues that the trial court erred in finding the stop illegal and cites Whren v. United States (1996),571 U.S. 806, and Dayton v. Erickson (1996), 76 Ohio St.3d 3, in support. We find the State's argument persuasive.
In his motion to suppress, Keller claimed the stop was illegal because Lieutenant Smart became suspicious of Keller before Smart saw him following the tractor trailer too closely, and that Smart "stalked" Keller on the highway until he committed a traffic violation. Consequently, Smart's stop of Keller for failing to maintain an assured safe distance was a pretext and thus illegal. The trial court agreed, stating as follows:
 It would seem that once the Texas license plate was spotted [on Keller's car], Lieutenant Smart's instincts alerted him that narcotics could be aboard the vehicle. He then traveled with the vehicle noticing strange behavior. He waited until the Defendant began traveling too close to the * * * [tractor trailer] to finally stop the Defendant. At this time it would appear that there was no reason to stop the Defendant other than a hunch of what he may find in the vehicle. Further, Lieutenant Smart had no reason to believe that criminal activity was occurring as stated in Terry v. Ohio [(1967), 392 U.S. 1] to stop the Defendant.
Docket No. 15 at 3 (emphasis added).
Both Keller and the trial court, however, failed to acknowledge the Ohio Supreme Court's holding in Dayton v. Erickson
(1996), 76 Ohio St.3d 3, in which the court found that a police officer's stop of a vehicle based on probable cause that a traffic violation has occurred or was occurring is not constitutionally offensive "even if the officer had some ulterior motive for making the stop, such as a suspicion that the violator was engaging in more nefarious criminal activity." Erickson, supra at syllabus. The facts of this case fall squarely within the holding inErickson.
Once Lieutenant Smart observed Keller driving his rented car as close as one car length behind the tractor trailer, he had probable cause to stop him for violating R.C. § 4511.34 which requires a driver to leave enough space between his car and the vehicle ahead so that another vehicle "may enter and occupy such space without danger." Though Smart quite openly testified that he had formed a suspicion that "there might be a problem" with Keller before the traffic violation occurred, under Erickson the chronological order of those two events is irrelevant. This remains true even if Smart were, as Keller suggests, "lying in wait" for Keller to give him an excuse to pull Keller over. So long as Smart had probable cause to believe Keller had committed a traffic violation, the subsequent stop was legal. We agree with the State, therefore, that the trial court erred in holding otherwise.
Next, the State argues that Lieutenant Smart's detention of Keller was not of an unreasonable duration. Since Keller does not dispute the State's contention on that point, and because it was not an issue before the trial court, we need not address the State's claim.
Finally, the State argues that the trial court erred in finding the search of Keller's car to be illegal. In its decision, order, and entry, the court concluded as follows:
 Even if the stop would have been valid, the search of the vehicle was not. Lieutenant Smart decided to call the K-9 unit only after approaching the Defendant to tell him that he was being stopped for following too closely. There was [sic] no articulable facts which would authorize the calling of the drug dog to the scene. Lieutenant Smart testified that the Defendant's behavior was weird in that he seemed disinterested in his [Lieutenant Smart's] presence and that he [the Defendant] did not speak but rather stared intensely. These facts did not warrant the K-9 unit's investigation.
 The language used by the trial court suggests to us that it labored under the belief that the dog sniff constituted a search, or that, at least to some extent, a law enforcement officer must have a reasonable suspicion, based on articulable facts that a suspect is in possession of narcotics before employing a drug-sniffing dog's ol'factory system for narcotics detection purposes. In United States v. Place (1983), 462 U.S. 696, however, the United States Supreme Court stated in dicta that a canine sniff does not require the opening of the object to be sniffed, nor does it expose the contents of the object to public view. Id. at 707. Characterizing the dog sniff test as sui generis, the Court concluded that it was not a "search" within the meaning of the Fourth Amendment of the United States Constitution. Id.
Later Ohio cases confronting the issue of whether a dog sniff of a lawfully detained vehicle constitutes a search under the United States or Ohio constitutions have confirmed what the Supreme Court suggested in the Place dicta. See State v. Rusnak
(1997), 120 Ohio App.3d 24; State v. French (1995), 104 Ohio App.3d 740; State v. Carlson (1995), 102 Ohio App.3d 585; State v.Waldroup (1995), 100 Ohio App.3d 508; State v. Palicki (1994),97 Ohio App.3d 175; State v. Riley (1993), 88 Ohio App.3d 468; Statev. Kennedy (Sept. 30, 1999), Ross App. No. 99CA2472, unreported;State v. Green (May 14, 1999), Wood App. No. WD-98-068, unreported; State v. Coonrod (Feb. 2, 1999), Washington App. No. 98CA2411, unreported; State v. Griffith (Aug. 10, 1998), Madison App. No. CA97-09-044; State v. Ballard (Dec. 28, 1993), Auglaize App. No. 2-93-7, unreported. Furthermore, because use of a trained narcotics dog is not a search, an officer need not have formed a reasonable suspicion that drug-related activity is occurring in order to request that a drug dog be brought to the scene or to conduct a dog sniff of the vehicle. Carlson, supra;Kennedy, supra; Kennedy, supra; Green, supra; In re Dengg (May 3, 1999), Portage App. No. 97-P-0113, unreported; Griffith, supra;State v. Shook (June 15, 1994), Lorain App. No. 93CA005716, unreported; Ballard, supra. Once a narcotics trained dog alerts to the presence of contraband, probable cause exists for a further search of the vehicle. French, supra; Carlson, supra; Waldroup,supra; Palicki, supra; Kennedy, supra; Green, supra; Dengg,supra; Griffith, supra.
Here, we have found Keller was lawfully stopped by Lieutenant Smart. At the time the narcotics trained dog arrived at the scene and performed the sniff of Keller's rented vehicle, Smart was still waiting for the results of the driver's license check from the KDT computer. Thus, Keller was lawfully detained during the dog sniff test, and his detention was not extended in order to conduct the dog sniff of his car. Under the law as it currently stands, we are compelled to conclude, albeit with reluctance, that the dog sniff test of Keller's car required no reasonable suspicion, or as the trial court put it, articulable facts to suggest that drug activity was taking place, and was therefore legal. Moreover, probable cause for the law enforcement officers' subsequent search of Keller's vehicle was established when the dog alerted indicating the presence of contraband.
Accordingly, the State's sole assignment of error is sustained and the judgment of the trial court is reversed. We remand this cause to the trial court for further proceedings not inconsistent with this opinion.
BROGAN, J. and FAIN, J., concur.