[Cite as *State v. Shook*, 2014-Ohio-3403.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
PIKE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | Case No. 13CA841 |
| v. | : | |
| | | DECISION AND |
| KEITH SHOOK, | : | JUDGMENT ENTRY |
| Defendant-Appellant. | : | RELEASED 07/31/2014 |

APPEARANCES:

W. Jeffrey Moore, Moore & Yaklevich, Columbus, Ohio, for Appellant.

Robert Junk, Pike County Prosecuting Attorney, Waverly, Ohio, for Appellee.

Hoover, J.

{¶ 1} Keith Shook appeals his conviction in the Pike County Common Pleas Court for drug possession, stemming from a traffic stop where police seized cocaine from Shook's shoes. Specifically, Shook appeals the trial court's denial of his motion to suppress evidence and argues that the traffic stop was illegal because it was not supported by a reasonable and articulable suspicion of criminal activity. Shook also contends that even if the stop was proper, he was unlawfully detained even after the reason for the stop had been resolved and the reasonable suspicion had dissipated. We find that law enforcement did have a reasonable, articulable suspicion to stop Shook's vehicle because the West Virginia license plate displayed on the vehicle did not immediately appear registered in Shook's name, indicating a possible violation of Ohio traffic law; and the duration of the stop was not unreasonable because the officer had yet to determine whether the license plate was valid, despite diligent efforts, when he discovered the

illegal contraband. Moreover, while the law enforcement officer investigated the license plates, he was informed of Shook's history of drug and weapon offenses, observed that Shook appeared extremely nervous, and obtained a confession from Shook that marijuana was present in the vehicle; all of which justified the officer's continued detention and investigation into whether Shook may have been involved in additional criminal activity. Accordingly, we affirm the judgment of the trial court.

## I. FACTS

{¶ 2} On May 7, 2011, just before 11:19 p.m., Trooper Benjamin R. Seabolt of the Ohio State Highway Patrol observed Shook's vehicle being driven in a southerly direction on U.S. Route 23 near milepost 12 in Pike County, Ohio. Shook was the sole occupant of the vehicle. Trooper Seabolt initiated a stop of Shook's vehicle, near milepost 8, after he observed the vehicle traveling at a rate of speed significantly below the posted speed limit, and after he was unable to determine whether the West Virginia license plate affixed to the vehicle had actually been issued to Shook or any other person. Trooper Seabolt specifically testified at the suppression hearing that he conducted an in-car LEADS computer check of Shook's West Virginia license plate and that the check indicated that the plate was not registered on file in West Virginia. Trooper Seabolt further explained that prior to initiating the stop, he had post dispatch conduct its own LEADS computer check of the license plate, which also indicated that the plate was not on file. Trooper Seabolt stated that based on his experience, license plates that are not registered are often stolen or fictitious. Thus, he felt it necessary to stop Shook and conduct an investigation regarding the validity of the plates.

{¶ 3} Upon stopping Shook, Trooper Seabolt requested his license, registration, and insurance card. Shook was not immediately able to produce those items. Trooper Seabolt also

testified that Shook was unable to produce any documents proving that the license plate displayed on the vehicle had actually been registered to the vehicle. However, Shook did produce a separate set of plates from inside the vehicle that were registered to the vehicle.

{¶ 4} Trooper Seabolt also described Shook's demeanor as "overly nervous," physically shaking, unresponsive, and often staring out the windshield and avoiding eye contact. According to Trooper Seabolt, Shook had told him that he was traveling from Clarksburg, West Virginia, to Huntington, West Virginia. Trooper Seabolt found this comment to be suspicious, given the traveled route taken by Shook. Trooper Seabolt then asked a few follow up questions, in which Shook indicated that he stopped in Columbus, Ohio, to visit his grandmother. Shook originally stated that he was traveling to Huntington to visit his son, but when asked again, he stated that he was traveling there to see his mother for Mother's Day. When asked where his mother lived, Shook stated that he did not know because he had not visited her for years.

{¶ 5} Trooper Seabolt also testified that while he initially questioned Shook about the license plates, patrol dispatch conducted a LEADS criminal history check, and informed him that Shook had a history of drug and weapons charges. At that time, Trooper Seabolt requested that Shook exit the vehicle, and he conducted a "consent pat-down" search for weapons on Shook's person. No weapons were found as a result of the pat-down. Because it was raining outside, Trooper Seabolt then seated Shook in the front passenger seat of his patrol cruiser and continued to investigate the license plate issue.

{¶ 6} Once inside the patrol cruiser, Trooper Seabolt advised Shook of his *Miranda* rights. He testified that Shook's conflicting story about his travel itinerary and overly nervous behavior raised his suspicions about possible drug activity being involved in his travels. Trooper Seabolt indicated that even while Shook was in the cruiser, dispatch continued its efforts to

identify the license plate and to determine whether it had been issued for Shook's vehicle. These efforts included direct communication with West Virginia authorities.

{¶ 7} While in the cruiser, and while awaiting the results of the dispatch investigation, Trooper Seabolt asked Shook whether there were any drugs in his vehicle. Shook admitted that there was a small quantity of marijuana behind the front seat. During the questioning regarding the possible presence of drugs, Trooper Seabolt observed that Shook avoided eye contact and was overly nervous. Trooper Seabolt then asked Shook whether there were any drugs concealed in his shoes, because in his experience, smuggling drugs in one's shoes is common practice. Shook responded that there were no drugs concealed in his shoes, but a shocked look came across Shook's face. Trooper Seabolt then instructed Shook to remove his shoes, and Shook removed one shoe but quickly put the shoe back on his foot before allowing Trooper Seabolt to see inside the shoe. Shook also refused to comply with Trooper Seabolt's order to hand the shoe over. Trooper Seabolt then exited the patrol cruiser and began walking around the front of the cruiser, at which time Shook exited the cruiser and ran from Trooper Seabolt. Trooper Seabolt twice instructed Shook to get back into the cruiser, but Shook continued to run away. As Shook ran, both of his shoes came off his feet. Trooper Seabolt pursued Shook on foot, and after chasing him approximately 100 yards, Shook tripped and fell to the ground. When Trooper Seabolt came to within 15 feet of Shook, Shook got back on his feet and continued running. At that time, Trooper Seabolt deployed his taser. When the taser probes struck Shook, he fell to the ground and was handcuffed by Trooper Seabolt.

{¶ 8} Once Shook was placed back inside the patrol cruiser, Trooper Seabolt retrieved Shook's shoes and conducted a search of the shoes. Each shoe had a package of white powder pressed flat under the insole. The powder field-tested positive for cocaine. Shook then admitted

that he agreed to transport the drugs for another person, and that he was to be paid $700 for transporting the drugs to Huntington. The packages of cocaine weighing approximately 350 grams in total were seized. A search of the vehicle also revealed approximately 28 grams of marijuana found inside the pocket of a pair of shorts behind the driver's seat of the vehicle. Also seized from Shook's wallet was $479 in U.S. currency. Shook was arrested on charges of possession and trafficking of drugs and was incarcerated in the Scioto County jail.

{¶ 9} Shook was thereafter indicted by the Pike County Grand Jury and charged with one count of trafficking in drugs, in violation of R.C. 2925.03(A)(2), and one count of possession of drugs, in violation of R.C. 2925.11(A). Each count carried two identical specifications, the first being that Shook used his motor vehicle to facilitate the commission of the crimes, and the second being that Shook used the U.S. currency found on his person to facilitate the commission of the crimes.

{¶ 10} At his arraignment, Shook pled not guilty to all counts and all specifications. Shortly thereafter, Shook filed a motion to suppress any evidence obtained as a result of the stop, detainment, and arrest, arguing that his constitutional rights were violated. Shook also filed a motion to suppress statements made to law enforcement and a motion to suppress identification, but those motions were later withdrawn.

{¶ 11} A hearing on the motion to suppress evidence was continued twice, at Shook's request, but was eventually held by the trial court. The following evidence was presented and admitted at the suppression hearing: the testimony of Trooper Seabolt, a digital recording made by Trooper Seabolt's dashboard camera, a copy of a portion of Trooper Seabolt's investigation report, and a copy of a hand-written document purportedly signed by a person employed by the

West Virginia Division of Motor Vehicles, with a facsimile date of January 25, 2012.[1] The hand-written note contains what appears to be a seal of the West Virginia Division of Motor Vehicles, and explains that the plate at issue in this case was a "loaner" plate that was issued to Shook until his personalized plates (the ones that Shook produced from inside the vehicle) were created. The document further explains that the "loaner" plates were inactivated and removed from the "system" on May 2, 2011, when Shook received his personalized plates.

{¶ 12} After the suppression hearing, each party submitted a supplemental brief on the suppression issues. Ultimately, the trial court issued a written decision overruling the motion to suppress. The trial court determined that the State presented sufficient evidence to establish that the initial stop of Shook's vehicle was justified by reasonable and articulable suspicion that the vehicle was being operated with a fictitious license plate. The trial court further found that:

> * * * after the initial, justifiable stop of [Shook's] vehicle, the duration of the stop was not unreasonable, that [Shook] voluntarily waived his *Miranda* rights and voluntarily answered Tpr. Seabolt's questions concerning the possibility of drugs in his vehicle, admitting the presence of an illegal drug in his vehicle, that the subsequent apprehension and arrest of defendant, following his flight from the cruiser, was with reasonable and probable cause, and that the search of [Shook's] shoes was justifiable as a search incident to a valid arrest.

[Decision and Journal Entry at 7.]

{¶ 13} Following the denial of his motion to suppress, Shook entered into a negotiated plea deal with the State. The deal required Shook to plea no contest to the drug possession offense and specifications in exchange for the dismissal of the drug trafficking offense and

---

[1] The digital recording from Trooper Seabolt's dashboard camera was not transmitted to this Court. The appellate record does contain, however, a copy of the suppression hearing transcript, a copy of a portion of the investigation report, and a copy of the hand-written note.

specifications. The plea deal did not require the State to make any sentencing recommendations. A change in plea hearing was held in which the trial court was informed of the plea deal. The trial court accepted Shook's no contest plea, found him guilty of the offense of drug possession and the specifications, and deferred sentencing for a later date so that a pre-sentence investigation could be conducted.

{¶ 14} Shook was later sentenced for the possession of drugs conviction[2]; however the sentence has been stayed pending disposition of this matter on appeal.

## II. ASSIGNMENT OF ERROR

{¶ 15} Shook's brief does not contain a separate statement of the assignments of error. *See* App.R. 16(A)(3). Rather than dismiss the appeal, we have synthesized the following assignment of error from the argument portion of Shook's brief.

Assignment of Error:

> THE TRIAL COURT ERRED IN OVERRULING THE MOTION TO SUPPRESS.

## III. STANDARD OF REVIEW

{¶ 16} In his sole assignment of error, Shook contends that the trial court erred when it denied his motion to suppress evidence. In particular, Shook argues that the evidence in this case was recovered as a result of an unlawful stop and detention by law enforcement; and thus should be suppressed.

{¶ 17} Our review of a trial court's decision on a motion to suppress presents a mixed question of law and fact. *State v. Burnside,* 100 Ohio St.3d 152, 2003–Ohio–5372, 797 N.E.2d 71, ¶ 8. When considering a motion to suppress, the trial court acts as the trier of fact and is in the best position to resolve factual questions and evaluate witness credibility. *Id.* Accordingly,

---

[2] The sentencing entry also ordered that count one, the drug trafficking charge, be dismissed in accordance with the negotiated plea deal. Thus, the sentencing entry is a final, appealable order.

we defer to the trial court's findings of fact if they are supported by competent, credible evidence. *Id*. Accepting those facts as true, we must independently determine whether the trial court reached the correct legal conclusion in analyzing the facts of the case. *Id*.

## IV. LAW AND ANALYSIS

A. The Factual Dispute

{¶ 18} As an initial matter, we note that Shook disputes the trial court's factual finding in its decision denying his motion to suppress, that the initial stop of his vehicle was the result of the unregistered license plate. Rather, Shook contends that he was stopped only because he was going below the speed limit, and that Trooper Seabolt did not check his license plate until after he had been pulled over.

{¶ 19} We have reviewed the record, and we find that the trial court's factual determination is supported by competent, credible evidence. Specifically, Trooper Seabolt testified that he ran an in-car computer check of Shook's plates prior to pulling him over, and that he had patrol dispatch run a similar check prior to initiating the stop. When challenged on cross-examination that he could clearly be heard on the digital recording - which we note was not transmitted to this Court even though it was admitted as evidence at the hearing - radioing the license plate number to dispatch after he had stopped Shook's vehicle, Trooper Seabolt explained that the recording commences only when the cruiser lights are activated, and that he had previously run the plate and requested dispatch to do the same prior to the commencement of the recording. Because the trial court is in a better position to judge the credibility of witnesses, and clearly found Trooper Seabolt's testimony to be credible, and because we must defer to the factual findings of the trial court if supported by competent, credible evidence, we do not find that the trial court erred in determining that the plate was checked prior to initiating the traffic

stop. Next, we must determine whether these facts satisfied the applicable legal standard and supported the trial court's decision to deny the motion.

B. The Traffic Stop

{¶ 20} Shook first argues in support of his assignment of error, that the traffic stop was unlawful. " 'The Fourth Amendment to the United States Constitution and the Ohio Constitution, Article I, Section 14, prohibit unreasonable searches and seizures.' " *State v. Shrewsbury*, 4th Dist. Ross No. 13CA3402, 2014-Ohio-716, ¶ 14, quoting *State v. Emerson*, 134 Ohio St.3d 191, 2012-Ohio-5047, 981 N.E.2d 787, ¶ 15. "This constitutional guarantee is protected by the exclusionary rule, which mandates the exclusion of the evidence obtained from the unreasonable search and seizure at trial." *Id.*, citing *Emerson* at ¶ 15; *see also State v. Lemaster*, 4th Dist. Ross No. 11CA3236, 2012-Ohio-971, ¶ 8 ("If the government obtains evidence through actions that violate an accused's Fourth Amendment rights, that evidence must be excluded at trial.").

{¶ 21} "An officer's temporary detention of an individual during a traffic stop constitutes a seizure of a person within the meaning of the Fourth Amendment * * *." *State v. Lewis*, 4th Dist. Scioto No. 08CA3226, 2008-Ohio-6691, ¶ 14; *see also State v. Eatmon*, 4th Dist. Scioto No. 12CA3498, 2013-Ohio-4812, ¶ 13 (quoting *Lewis*). "To be constitutionally valid, the detention must be reasonable under the circumstances." *Lewis* at ¶ 14. "While probable cause 'is certainly a complete justification for a traffic stop,' it is not required." *Eatmon* at ¶ 13, quoting *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 23. "So long as 'an officer's decision to stop a motorist for a criminal violation, including a traffic violation, is prompted by a reasonable and articulable suspicion considering all the circumstances, then the stop is constitutionally valid.' " *Id.*, quoting *Mays* at ¶ 8. "Reasonable and articulable suspicion is a lower standard than probable cause." *Id.*, citing *Mays* at ¶ 23. " 'To conduct an investigatory

stop, the officer must be able to point to specific and articulable facts which, taken together with rational inferences derived from those facts, give rise to a reasonable suspicion that the individual is engaged or about to be engaged in criminal activity.' " *Id*., quoting *State v. Kilbarger*, 4th Dist. Hocking No. 11CA23, 2012-Ohio-1521, ¶ 15. " 'The propriety of an investigative stop by a police officer must be viewed in light of the totality of the surrounding circumstances.' " *Id*., quoting *State v. Freeman*, 64 Ohio St.2d 291, 414 N.E.2d 1044 (1980), paragraph one of the syllabus.

{¶ 22} Here, Shook contends that Trooper Seabolt lacked a reasonable and articulable suspicion to justify the initial stop of his vehicle. Shook's contention, however, is based upon his argument that he was stopped for driving too slow. This argument is misplaced, because as we discussed above, the stop did not occur in response to the speed his vehicle was traveling. Rather, Shook was stopped because his vehicle did not display properly registered license plates.

{¶ 23} R.C. 4549.08 prohibits the operation of a motor vehicle upon the public roads and highways if it displays a license plate that is fictitious, counterfeit, or that belongs to another motor vehicle. A violation of R.C. 4549.08 is a misdemeanor of the fourth degree on the first offense, and a misdemeanor of the third degree on each subsequent offense. R.C. 4549.08(C). At the time that Trooper Seabolt had initiated the stop of Shook's vehicle, he had already verified that the license plate affixed to Shook's vehicle was not registered on file with West Virginia authorities. Thus, Patrolmen Seabolt had a reasonable, articulable suspicion that Shook had committed a motor vehicle violation. *See State v. Taylor*, 4th Dist. Washington No. 07CA11, 2008-Ohio-482, ¶ 15 ("It is well-settled that a law enforcement officer possesses both reasonable suspicion and probable cause to stop a vehicle when the officer observes a traffic violation."). At that point in time, Trooper Seabolt was justified in stopping the vehicle to investigate whether a

violation of R.C. 4549.08 had in fact occurred, or if Shook could provide documentation showing that the license plates were valid. Therefore, the trial court correctly determined that the traffic stop was constitutionally valid.

C. The Scope and Duration of the Traffic Stop

{¶ 24} Next, Shook contends that regardless of the legality of the initial stop, once he produced the valid license plates that were located inside the vehicle, any suspicion of criminal activity ended and the detention should have ceased. Shook argues that the continued detention after the production of the valid plates changed the nature and scope of the stop from an investigation of the license plate issue, to a "drug and gun fishing expedition." [Brief at 7.]

{¶ 25} "The scope and duration of a routine traffic stop 'must be carefully tailored to its underlying justification * * * and last no longer than is necessary to effectuate the purpose of the stop.' " *State v. Houston*, 4th Dist. Scioto No. 12CA3472, 2013-Ohio-686, ¶ 24, quoting *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). "The rule set forth in *Royer* is designed to prevent law enforcement officers from conducting 'fishing expeditions' for evidence of a crime." *Id*.

{¶ 26} "When a law enforcement officer stops a vehicle for a traffic violation, the officer may detain the motorist for a period of time sufficient to issue the motorist a citation and to perform routine procedures such as a computer check on the motorist's driver's license, registration, and vehicle plates." *State v. Aguirre,* 4th Dist. Gallia No. 03CA5, 2003–Ohio–4909, ¶ 36, citing *State v. Carlson,* 102 Ohio App.3d 585, 598, 657 N.E.2d 591 (9th Dist.1995). " 'In determining if an officer completed these tasks within a reasonable length of time, the court must evaluate the duration of the stop in light of the totality of the circumstances and consider whether the officer diligently conducted the investigation.' " *Id.,* quoting *Carlson* at 598; *see also State v.*

*Cook,* 65 Ohio St.3d 516, 521–522, 605 N.E.2d 70 (1992) (fifteen minute detention was reasonable); *United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (twenty minute detention was reasonable).

{¶ 27} We agree with the trial court's conclusion that the duration of the stop and continued detention was not unreasonable. The evidence adduced at the suppression hearing demonstrates that both an in-car computer check and dispatch computer check of Shook's license plate displayed a result of not in file. Upon questioning Shook about the plates, Shook was not able to produce any documentation showing that the plate affixed to the vehicle had actually been issued for the vehicle. Shook was also unable to immediately produce his driver's license, proof of insurance, and registration. Trooper Seabolt also requested that dispatch contact West Virginia authorities to verify whether the plates were valid. During the stop, Trooper Seabolt also learned that Shook had a history of drug and weapons arrests. Based on this information, he performed a pat-down search for weapons. Trooper Seabolt was still waiting to hear from the West Virginia authorities when Shook admitted that a small quantity of marijuana was in the vehicle and when Shook fled from the cruiser when asked whether he had drugs concealed in his shoes. Moreover, Shook's production of the valid set of plates did not alleviate Trooper Seabolt's concerns, as Shook suggests, because there was still no indication of whether the plates that were actually displayed on the vehicle were valid. Finally, the trial court noted in its decision and journal entry that the entire duration of the stop, from the time Trooper Seabolt activated his overhead pursuit lights to the time that Shook exited the patrol cruiser and began to run away, lasted a total of 20 minutes.[3] [Decision and Journal Entry at 5.] Thus, based on the totality of the

---

[3] The trial court calculated the duration of the stop by viewing the time-stamped digital recording, which again, was admitted as evidence at the suppression hearing but was not transmitted to this Court. Shook does not contest the trial court's time calculation.

circumstances, we find that Trooper Seabolt acted diligently in investigating the validity of the

license plate attached to Shook's vehicle and that the duration of the stop was not unreasonable.

{¶ 28} Finally, we disagree with Shook's argument that the scope and nature of the stop

unlawfully changed from an investigation of the license plate to a gun and drug fishing

expedition.

{¶ 29} "An officer may expand the scope of the stop and may continue to detain the

vehicle without running afoul of the Fourth Amendment if the officer discovers further facts

which give rise to a reasonable suspicion that additional criminal activity is afoot." *State v. Rose*,

4th Dist. Highland No. 06CA5, 2006-Ohio-5292, ¶ 17, citing *State v. Robinette*, 80 Ohio St.3d

234, 240, 685 N.E.2d 762 (1997). The *Robinette* court explained, at paragraph one of the

syllabus:

> When a police officer's objective justification to continue detention of a person *
>
> * * is not related to the purpose of the original stop, and when that continued
>
> detention is not based on any articulable facts giving rise to a suspicion of some
>
> illegal activity justifying an extension of the detention, the continued detention to
>
> conduct a search constitutes an illegal seizure.

Conversely, "if a law enforcement officer, during a valid investigative stop, ascertains

'reasonably articulable facts giving rise to a suspicion of criminal activity, the officer may then

further detain and implement a more in-depth investigation of the individual.' " *Rose* at ¶ 17,

quoting *Robinette* at 241.

{¶ 30} Moreover, "[r]ecognizing that 'detention, not questioning, is the evil' at issue, * *

* so long as the traffic stop is valid, 'any questioning which occurs during the detention, even if

unrelated to the scope of the detention, is valid so long as the questioning does not improperly

extend the duration of the detention.' " *State v. Chagaris*, 107 Ohio App.3d 551, 556-557, 669 N.E.2d 92 (9th Dist.1995), quoting *State v. Wright*, 9th Dist. Medina No. 2371-M, 1995 WL 404964, *3-4 (June 28, 1995).

{¶ 31} With the above principles in mind, we conclude that the continued detention of Shook was justified not only by the ongoing investigation of the license plate, but also because of the existence of various factors giving rise to a reasonable suspicion that additional criminal activity was afoot. Notably, Shook gave conflicting stories regarding the purpose of his travels, Trooper Seabolt was informed of Shook's criminal history of drug and weapons arrests, and Shook admitted that marijuana was present in the vehicle. These factors coupled with the license plate issue and Shook's nervous, erratic, and evasive behavior gave the officer reasonable cause to investigate whether Shook may have been involved in further criminal activity. Trooper Seabolt was thus entitled to inquire further[4] and to detain Shook until he dispelled or confirmed his suspicions. Accordingly, Shook's argument that the nature of the stop and detention unlawfully transformed into a gun and drug fishing expedition is without merit.

V. CONCLUSION

{¶ 32} Based upon the foregoing reasons, we overrule the sole assignment of error and affirm the judgment of the trial court.

JUDGMENT AFFIRMED.

---

[4] We further note that Trooper Seabolt's questioning of Shook concerning the presence of drugs in the vehicle and in his shoes, did not prolong the duration of the detention. As previously indicated, while Trooper Seabolt questioned Shook at the scene, dispatch continued to investigate the license plate registration issue.

Harsha, J., concurring:

{¶ 33} Once upon a time the rule in this appellate district was that it was illegal for officers to question a motorist stopped for a traffic offense about unrelated criminal matters absent the existence of a separate reasonable suspicion that arose during the traffic stop. In other words, officers could not expand the scope of the investigative stop regardless of whether it did not expand the duration of the initial stop. See *State v. Anderson*, 100 Ohio App.3d 688, 654 N.E.2nd 1034 (4th Dist. 1995). However, in the *Robinette* trilogy the Supreme Court of Ohio effectively overruled *Anderson*. *Robinette III* declared continued detention for the purpose of obtaining permission to search the car absent a separate reasonable suspicion was illegal. But based upon public policy it also held that continued detention to ask questions about the presence of drugs or weapons was a lawful extension of the original stop even in the absence of a separate factual basis for such an inquiry.  See *State v. Robinette*, 80 Ohio St.3d 234, 241, 1997-Ohio-343, 685 N.E.2d 762 (*Robinette III*) and Katz, *Ohio Arrest Search & Seizure*, Section 18:11 (2014).

{¶ 34} Based on *Robinette, III*, I concur.

**JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED. Appellant shall pay the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Pike County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of the proceedings in that court. If a stay is continued by this entry, it will terminate at the earliest of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to the expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Harsha, J.: Concurs in Judgment and Opinion with Attached Concurring Opinion.
McFarland, J.: Concurs in Judgment Only.

For the Court

By:_____
     Marie Hoover, Judge

**NOTICE TO COUNSEL**

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.