[Cite as *State v. Bond*, 2025-Ohio-360.]

COURT OF APPEALS
RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | Hon. William B. Hoffman, P.J. |
| Plaintiff-Appellee | : | Hon. Craig R. Baldwin, J. |
| | : | Hon. Andrew J. King, J. |
| -vs- | : | |
| | : | |
| JABRIL BOND | : | Case Nos. 2024-CA-0009 |
| | : | 2024-CA-0010 |
| | : | |
| Defendant-Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:    Appeal from the Court of Common
Pleas, Case Nos. 2023 CR 0362 N &
2023 CR 0752 N


JUDGMENT:    Affirmed


DATE OF JUDGMENT:    February 3, 2025


APPEARANCES:

For Plaintiff-Appellee    For Defendant-Appellant

MEGAN HOBART    JOSEPH C. PATITUCE
38 South Park Street    CATHERINE MEEHAN
Mansfield, OH  44902    16855 Foltz Industrial Parkway
Strongsville, OH  44149

*King, J.*

{¶ 1}   Defendant-Appellant Jabril Bond appeals the February 14, 2024 judgment of conviction and sentence of the Richland County Court of Common Pleas. Plaintiff-Appellee is the State of Ohio. We affirm the trial court.

FACTS AND PROCEDURAL HISTORY

{¶ 2}   This matter involves two Richland County criminal case numbers, 23CR362 and 23CR752.

{¶ 3}   Case number 23CR752 involved a traffic stop of Bond's vehicle on January 25, 2023. A probable cause search of the vehicle yielded promethazine with codeine.

{¶ 4}   Case number 23CR362 involved a traffic stop of a black Ford truck driven by Bond on April 18, 2023. Officer Justin Cikity of the Mansfield Police Department initiated the traffic stop. The area where Bond was operating the vehicle is a high-crime area. Officer Cikity's attention was drawn to the Ford due to Bond's erratic, evasive, high-speed driving as it approached Cikity from the opposite direction. Cikity could not see into the truck at the time because the window tint was too dark and therefore did not know who was driving or if there were any passengers. Cikity turned around, relocated the vehicle and began following it. When Bond failed to stop at a stop sign, Cikity attempted to initiate a traffic stop as Bond approached a red traffic light. Bond gave no indication he was going to pull over. As Bond continued on, however, he had to pull into a gas station as the road ahead was closed preventing him from going farther. Bond parked the truck next to a gas pump.

{¶ 5}   Cikity called for backup. Given Bond's erratic and evasive behavior Officer Cikity was concerned for the safety for members of the general public at and near the gas

station, the officers en route, and himself. He did not know who was in the truck or what had happened before the stop to cause Bond to operate the truck in such a manner.

{¶ 6}   Officer Cikity used his public address system to order Bond to put all of the truck windows down. Bond put his own window down, but only a few inches. Cikity could tell there was more than one person in the truck, but could not tell how many. He ordered all the occupants of the vehicle to put their hands outside the vehicle, but none did. Cikity drew is weapon. Bond eventually put one hand out the window while he did something with his cell phone with the other. This coupled with Bond's and his passenger's non-compliance further made Cikity feel his safety and that of those present at the gas station was in jeopardy.

{¶ 7}   Officer Cikity then recognized Bond due to previous encounters with him. He also knew others would be showing up at Bond's request as he has called family members to traffic stops in the past and his mother had to be detained at one of those stops. This presented yet additional safety concerns for Cikity.

{¶ 8}   Four minutes into the stop Bond and his passengers were still failing to comply with simple orders. Four and a half minutes into the stop, one passenger finally put their hands outside the vehicle as directed. Six minutes into the stop Bond finally exited the truck as directed. Shortly before Bond exited the truck, backup arrived including officer Jacob Rietschlin and his canine Mekel.

{¶ 9}   Eight and a half minutes into the stop Bond's passenger, Anthony Reed exited the truck. At approximately the same time, Bond's sister and mother arrived at the scene and pulled in front of Bond's truck again complicating safety concerns for the officers involved. Nine minutes into the stop a third individual, Khiren Willis exited the truck. All three men got out of the truck holding cell phones.

{¶ 10} Officers then approached the truck to make sure there were no other passengers. Cikity directed Rietschlin to walk canine Mekel around the truck and Mekel alerted to the presence of narcotics. A subsequent search of the vehicle yielded large quantities of methamphetamine, fentanyl, and crack cocaine behind the dashboard as well as burnt marijuana in plain view.

{¶ 11} As a result of these events, the Richland County Grand Jury returned an indictment charging Bond with one count each of trafficking in a fentanyl-related compound, a felony of the first degree, possession of a fentanyl-related compound, a felony of the first degree, trafficking in cocaine, a felony of the first degree, aggravated trafficking in drugs, a felony of the second degree, possession of cocaine, a felony of the first degree, possession of drugs, a felony of the second degree, and participation in a criminal gang, a felony of the second degree.

{¶ 12} Bond entered pleas of not guilty and filed a motion to suppress in both case numbers. However, Bond later withdrew his motion to suppress in case 2023 CR 0752 involving possession of promethazine with codeine.

{¶ 13} On December 22, 2023, a hearing was held on Bond's remaining motion to suppress and the above outlined facts were elicited. Bond argued the stop was unconstitutionally expanded and the truck unconstitutionally searched. He further argued the canine sniff was improper because Officer Rietschkin touched the exterior of the truck during the search and the dog's nose entered an open window at Rietschkin's direction. At the conclusion of the hearing the parties were directed to submit written closing arguments. On January 12, 2024 the trial court issued its judgment overruling Bond's motion to suppress.

{¶ 14} On February 12, 2024, Bond entered pleas of no contest as charged in each case. He was sentenced to an aggregate total of 20 to 25 years incarceration.

{¶ 15} Bond timely filed an appeal and the matter is now before this court for consideration. He raises five assignments of error as follow:

I

{¶ 16} "THE TRIAL COURT ERRED WHEN IT FOUND THAT OFFICER CIKITY DID NOT EXTEND THE TRAFFIC STOP BEYOND ITS ORIGINAL SCOPE IN ORDER TO CONDUCT A K9 SNIFF."

II

{¶ 17} "THE TRIAL COURT ERRED IN FINDING THAT THE K9 SEARCH WAS PROPER, DESPITE THE OFFICER TOUCHING THE VEHICLE IN ORDER TO FACILITATE THE SEARCH, AND THE K9 ENTERING CONSITUTIONALLY PROTECTED SPACE."

III

{¶ 18} "THE TRIAL COURT ERRED IN FINDING THAT THE K9 INDICATED STABLISHING PROBABLE CAUSE TO ALLOW A SEARCH OF THE VEHICLE."

IV

{¶ 19} "THE TRIAL COURT ERRED WHEN IT FAILED TO EXPLAIN THE EFFECT OF A NO CONTEST PLEA DURING THE CRIM.R. 11 PLEA COLLOQUY. "

V

{¶ 20} "APPELLANT'S PLEA WAS NOT KNOWING, INTELLIGENT, OR VOLUNTARY.

I

{¶ 21} In his first assignment of error, Bond argues the traffic stop was impermissibly extended beyond its original scope in order to conduct a canine sniff. We disagree.

Standard of Review

{¶ 22} There are three methods of challenging on appeal a trial court's ruling on a motion to suppress. First, an appellant may challenge the trial court's findings of fact. In reviewing a challenge of this nature, an appellate court must determine whether said findings of fact are against the manifest weight of the evidence. *State v. Fanning,* 1 Ohio St.3d 19 (1982)*; State v. Klein,* 73 Ohio App.3d 486 (1991); *State v. Guysinger,* 86 Ohio App.3d 592 (1993). Second, an appellant may argue the trial court failed to apply the appropriate test or correct law to the findings of fact, in which case an appellate court can reverse the trial court for committing an error of law. *State v. Williams,* 86 Ohio App.3d 37, 619 N.E.2d 1141 (1993). Finally, assuming the trial court's findings of fact are not against the manifest weight of the evidence and it has properly identified the law to be applied, an appellant may argue the trial court has incorrectly decided the ultimate or final issue raised in the motion to suppress. When reviewing this type of claim, an appellate court must independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in any given case. *State v. Curry,* 95 Ohio App.3d 93 (1994); *State v. Claytor, 85 Ohio App.3d 623 (1993); Guysinger,* supra. As the United States Supreme Court held in *Ornelas v. U.S.,* 517 U.S. 690 (1996), "... as a general matter determination of reasonable suspicion and probable cause should be reviewed de novo on appeal."

{¶ 23} When ruling on a motion to suppress, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and to evaluate the credibility of witnesses. See *State v. Dunlap,* 73 Ohio St.3d 308, 314 (1995)*; State v. Fanning,* 1 Ohio St.3d 19, 20 (1982).

{¶ 24} Bond argues the trial court's factual findings were not supported by competent, credible evidence and the evidence presented did not satisfy the relevant legal standards.

Traffic Stops

{¶ 25} " '[W]hen detaining a motorist for a traffic violation, an officer may delay a motorist for a time period sufficient to issue a ticket or warning.' " *State v. Elliot*, 2019-Ohio-4411 (5 th Dist.) ¶ 21 quoting *State v. Batchili*, 2007-Ohio-2204, ¶ 12 quoting *State v. Keathley*, 55 Ohio App.3d 130, 131 (2nd Dist.1988). The scope and duration of a routine traffic stop "must be carefully tailored to its underlying justification  . . .and last no longer than is necessary to effectuate the purpose of the stop." *State v. Latona*, 2011-Ohio-1253 ¶¶ 20-21 (5th Dist.) quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983); see also, *State v. Gonyou*, 108 Ohio App.3d 369, 372 (6th Dist.1995). The measure of the time period includes the time sufficient to run a computer check of the driver's license, registration, and vehicle plates. *State v. Elliot*, 2019-Ohio-4411 ¶ 21 (5th Dist.) citing *State v. Bolden*, 2004-Ohio-184 ¶ 17 (12th Dist.) citing *Delaware v. Prouse*, 440 U.S. 648, 659 (1979). Additionally, " '[i]n determining if an officer completed these tasks within a reasonable length of time, the court must evaluate the duration of the stop in light of the totality of the circumstances and consider whether the officer diligently conducted the investigation.' " *Id.*, quoting *State v. Carlson*, 102 Ohio App.3d 585, 598-599 (9th Dist.1995), citing *State v. Cook*, 65 Ohio St.3d 516, 521-522 (1992), and *United States v.*

*Sharpe*, 470 U.S. 675 (1985). See also *State v. Whitman*, 2009-Ohio-5647 (5th Dist.); *State v. Woodson*, 2008-Ohio-670 ¶ 21 (5th Dist.).

{¶ 26} A canine walk-around of a vehicle, which occurs during a lawful stop and does not go beyond the period necessary to effectuate the stop does not violate the individual's constitutional rights. See *Illinois v. Caballes*, 543 U.S. 405 (2005). An officer may not, however, extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff. *Rodriguez v. U.S.,* 575 U.S. 348 (2015). The pertinent question is not whether the dog sniff occurs before or after the officer issues or could have issued the initial ticket, but whether the dog sniff adds time to the stop. *Id.*

Bond's Arguments

{¶ 27} Bond argues the trial court erred when it found the officers did not expand the stop, but rather Bond's actions did. We disagree.

{¶ 28} First, in support of his argument that the stop was illegally expanded, Bond cites *State v. Brown*, 2009-Ohio-3804 (6th Dist.). That matter, however, is factually distinguishable from the instant matter. In *Brown*, the officer questioned the driver and passenger separately and asked questions irrelevant to the purpose of the stop such as the purpose of their travel, where they were going, when they would return, and if there was cash or drugs in the vehicle. The Sixth District found these tactics impermissibly expanded the scope of the stop. *Id.* 343. There is no similar circumstance here.

{¶ 29} We have reviewed the transcript and video evidence in this matter. Bond was observed driving erratically and at high speeds in a high-crime area, failing to stop at a stop sign and failing to stop within a reasonable time of Officer Cikity activating his siren and overhead lights. Transcript of suppression hearing (T.) 11-13, State's exhibit 1A. While Bond argues the sole purpose of the stop was to issue a traffic violation for running

the stop sign, Bond's behavior prior to the stop raised Cikity's suspicion that more was afoot than a stop sign violation. T. 13. Moreover, Cikity could not issue a violation until Bond cooperated which he failed to do until more than six minutes into the stop. Instead, he failed to put both hands outside the vehicle as directed, called his family to come to the scene, and was seen reaching for something inside the vehicle. T. 20-25, State's exhibit 1A. The third and final person in the truck did not exit the truck until nine minutes into the stop. The canine arrived six and a half minutes into the stop and alerted on the vehicle eleven and a half minutes into the stop. T. 27. Officer Cikity testified a typical traffic stop takes between 10 and 15 minutes to complete. T. 7. The traffic stop was not delayed or expanded in order to bring a canine to the scene as Officer Rietschlin and canine Mekel were already on the scene before all occupants of the Ford had exited the vehicle. State's exhibits 1A, 3.

{¶ 30} Given the totality of the circumstances, we find the trial court did not err in finding the stop was not unconstitutionally expanded and that Bond's own actions increased officer suspicion that they were dealing with something more than a routine traffic stop. Moreover, evidence presented by the state demonstrated the dog sniff did not add time to the stop. Accordingly, the first assignment of error is overruled.

II

{¶ 31} In his second assignment of error, Bond argues the trial court erred in finding the canine sniff was proper because both the officer and the dog touched the exterior of the truck and the dog trespassed into a constitutionally protected space by putting its snout into the cabin of the truck at the direction of the officer. We disagree.

Fourth Amendment

{¶ 32} "The Fourth Amendment to the United States Constitution and the Ohio Constitution, Article I, Section 14, prohibit unreasonable searches and seizures." *State v. Emerson,* 2012-Ohio-5047, ¶ 15. "This constitutional guarantee is protected by the exclusionary rule, which mandates the exclusion at trial of evidence obtained from an unreasonable search and seizure." *Id.*

{¶ 33} Searches and seizures conducted without a warrant are per se unreasonable under the Fourth Amendment, subject only to a few specific and well-established exceptions. *Katz v. United States*, 389 U.S. 347, 357, (1967). "Once a defendant demonstrates that he or she was subjected to a warrantless search or seizure, the burden shifts to the state to establish that the warrantless search or seizure was constitutionally permissible." *State v. Roberts*, 2006-Ohio-3665, ¶ 98. In order to employ Fourth Amendment protections, a defendant must have a "constitutionally protected reasonable expectation of privacy." *Katz v. United States*, 389 U.S. 347, 360 (1967). The United States Supreme Court has directed reviewing courts to consider a two-part test in order to determine whether the Fourth Amendment is implicated. "First, has the individual manifested a subjective expectation of privacy in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable?" *California v. Ciraolo*, 476 U.S. 207, 211 (1986), citing *Katz* at 360.

Dog Sniff

{¶ 34} The use of a drug detection dog does not constitute a "search" and an officer is not required, prior to a dog sniff, to establish either probable cause or a reasonable suspicion that drugs are concealed in a vehicle. *Illinois v. Caballes*, 543 U.S. 405 (2005). An officer needs no suspicion or cause to run the dog around the stopped vehicle if he or

she does so contemporaneously with the legitimate activities associated with the traffic violation. *Id.* "A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment." *Id.*, 410.

### Canine Mekel

{¶ 35} During the suppression hearing, Officer Rietschlin explained that Mekel was trained for several purposes; article searches, narcotics, and apprehension. T. 68. He explained Mekel was initially on scene for the purpose of protection and was overly excited from serving that purpose. T. 80. In order to calm the dog and shift its attention from protection mode to narcotics search mode, Rietschlin walked Mekel in a circle, then approached the Ford and touched the corners, seams, and driver's side door handle in order to redirect Mekel's focus from protection to search. T. 82-83. When Rietschlin touched the driver's side door handle, Mekel very briefly put his front paws up onto the door handle. State's Exhibit 3. Mekel then indicated to the presence of narcotics T. 105-106. Additionally, burnt marijuana was observed in plain view. T. 32.

### Bond's Arguments

{¶ 36} We first address Bond's argument that Canine Mekel put his snout into the cabin of the Ford thereby intruding into a constitutionally protected space. We have reviewed Officer Rietschlin's body-worn camera footage from this stop. We note that at approximately 10:44 in the video, Rietschlin touches the Ford's driver's side door handle to direct Mekel's attention to the truck. Mekel then stands on his hind legs and briefly puts his front paws onto the driver's side door of the Ford. His snout reaches the outside of the lower portion of the driver's side window which is rolled up approximately six inches. At

no point does any part of Mekel's body enter the cabin area of the Ford. State's Exhibit 3. We therefore reject Bond's contention that the dog physically intruded into his vehicle at Ritschlin's direction without a warrant.

{¶ 37} As to the officer and the canine touching the exterior of the Ford, Bond cites *United States v. Jones*, 565 U.S. 400 (2012) for the proposition that touching the exterior of the truck constitutes an intrusion of a constitutionally protected area. But *Jones* did not involve a canine free-air sniff nor merely briefly touching the exterior of a vehicle. Instead *Jones* held that when the government *attaches* a GPS tracking device to a vehicle *and* uses the device to monitor the vehicle's movements on public streets, the action constitutes a Fourth Amendment search. *Id.* at 404.

{¶ 38} Bond also cites without discussion *Taylor v. City of Saginaw*, 922 F.3d 328, a Michigan case involving parking enforcement officers "chalking" tires of parked cars in order to determine how long they were parked in certain spaces. If vehicles were parked past the designated limit in these spaces, officers issued parking tickets. Taylor received several such tickets and sued the city alleging that chalking violated her Fourth Amendment right to be free from unreasonable searches. The city moved to dismiss the action. The district court granted the city's motion, finding that, while chalking may have constituted a search under the Fourth Amendment, the search was reasonable because there is a lesser expectation of privacy with automobiles. On appeal, the city argued in part that Taylor had a reduced expectation of privacy in an automobile. *Id.* 334. The Sixth Circuit disagreed and found chalking was a search and additionally stated: "the City commences its search on vehicles that are parked legally, without probable cause or even so much as "individualized suspicion of wrongdoing"—the touchstone of the reasonableness standard. See *Relford v. Lexington-Fayette Urban Cty. Gov't*, 390 F.3d

452, 458 (6th Cir. 2004) ("[A] search ordinarily must be based on individualized suspicion of wrongdoing."). Thus, we reject the City's contention that searching Taylor's vehicle was reasonable based solely on its reduced expectation of privacy." *Id.*

{¶ 39} The facts of this matter are distinguishable from *Taylor* as the encounter began with suspicion of wrongdoing and a valid traffic stop. As previously discussed, Cikity's attention was first drawn to Bond due to his erratic, high speed, evasive driving in a high crime area where Cikity had personally investigated shootings and drug activity. T. 9-11. Bond then failed to stop at a stop sign and failed to stop within a reasonable time after Cikity activated his overhead lights and siren causing Cikity to call for backup. T. 13-16. Once Bond did stop he initially refused to comply with simple orders, was seen doing something with his cell phone, and reaching into the vehicle instead of putting his hands outside the vehicle. T. 18-21.

{¶ 40} Officer Rietschlin arrived on scene with canine Mekel initially as back up and basic protection. T. 78. Rietschlin then walked Mekel around the truck which required no reasonable suspicion. Rietschlin testified his purpose in touching the exterior of the truck was to assist in redirecting Mekel's focus from protecting officers to conducting a free air sniff. T. 82-83. Unlike *Taylor* or *Jones*, no search was conducted through Rietschlin or Mekel briefly touching the exterior of the truck. The search did not occur until after the positive free-air sniff. We therefore find the trial court did not err in finding the canine sniff was proper.

{¶ 41} The second assignment of error is overruled.

III

{¶ 42} In his third assignment of error, Bond argues the trial court erred in denying his motion to suppress because testimony confirmed canine Mekel's lack of reliability. We disagree.

{¶ 43} In *Florida v. Harris*, 568 U.S. 237 (2012), the United States Supreme Court addressed how a court should evaluate probable cause based on an alert from a drug detection dog when the defendant has challenged the dog's reliability. *Id.* at 1053. The court rejected Florida's rigid test that required the state in every case to present exhaustive evidence of reliability in favor of a more flexible, common-sense approach that examines the dog's training. *Id.* In so doing, the court held that "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." *Id.* at 1057. However, the court noted that a defendant "must have an opportunity to challenge such evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses." *Id.* Regarding the reliability of a canine search, the United States Supreme Court has held that "[i]f a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." *Florida v. Harris*, 568 U.S. 237, 246-247 (2013).

{¶ 44} We first note that during the suppression hearing, counsel for Bond did pose questions to Officer Rietschlin regarding Mekel's training and reliability. However, Bond did not challenge Mekel's reliability or training in his written motion to suppress and the trial court made no finings in its ruling regarding Mekel's training or reliability. Judgment Entry, January 12, 2024.

{¶ 45} But even if Bond had properly raised the issue it would fail. In *State v. Nguyen*, 2004-Ohio-2879 (6th Dist.) ¶ 55, the court stated that "proof of the fact that a drug dog is properly trained and certified is the only evidence material to a determination that a particular dog is reliable. Proof that a drug dog is properly trained and certified may be established by means of testimony or through documentary proof." The court further noted that a "new trend in some federal courts stresses that when the state demonstrates that the drug dog is trained and certified, it negates any need to establish the reliability of the challenged canine." *Id.* at ¶ 35.

{¶ 46} Bond does not dispute that the State presented evidence of Mekel's training and certification. Instead he contends the dog was unreliable because Officer Rietschlin testified Mekel cannot discern the difference between hemp, a non-controlled substance, and marijuana, a controlled substance, and because Mekel had erroneously alerted or failed to appropriately alert in the past.

{¶ 47} First, no hemp was found in this matter. As to marijuana, at the time of this offense, marijuana was still a schedule I controlled substance. Thus, Mekel's inability to distinguish between the two is irrelevant. As for erroneous or failed alerts, Officer Rietschlin testified these occurred in a training environment, or in situations where there was likely a residual odor due to a previous presence of narcotics. T. 97-99.

{¶ 48} Officer Rietschlin testified that Mekel alerted on the Ford truck indicating the presence of narcotics. T. 105-106. Officer Rietschlin's body-worn camera footage was played for the court and the court heard Rietschlin's recitation of Mekel's proper training and certification thereby negating any argument as to the canine's reliability even if the matter had been raised by trial counsel and addressed by the trial court. The third assignment of error is overruled.

IV

{¶ 49} In his fourth assignment of error, Bond argues the trial court erred when it failed to properly inform him of the effect of his no contest plea. We disagree.

{¶ 50} Crim.R. 11(B)(2) states a "plea of no contest is not an admission of defendant's guilt, but is an admission of the truth of the facts alleged in the indictment, information, or complaint, and the plea or admission shall not be used against the defendant in any subsequent civil or criminal proceeding." Crim.R. 11(B).

{¶ 51} The sentencing in this matter involved two cases, 23-CR-752 and 23-CR-362. Before the sentencing hearing, Bond signed an "Admission of Guilt/Judgment Entry" in each case. The final paragraph of each document indicated in part: "By pleading no contest, I understand the court will decide my guilt based on a statement by the prosecutor, in the indictment, or otherwise about the evidence that would have been presented at trial on the offenses for which I was charged."

{¶ 52} During the plea hearing, the trial court began with case number 23-CR-752:

> The Court: All right, then at this time on case 23-CR-752 as to the
> one count of Possession of Drugs, a felony of the fifth degree, how
> do you wish to plea?
>
> Mr. Bond: No contest.
>
> The Court: All right. Before I accept your no contest plea, Mr. Bond,
> understand that a no contest plea is not an admission of guilt,
> however, you are admitting the facts as charged in the indictment to
> be true and accurate, do you understand that?

Mr. Bond: Yes, sir.

The Court: All right. Then at this time the court will find the plea is knowingly, voluntarily and intelligently given.

{¶ 53} T. at 11-12.

{¶ 54} The trial court then immediately went on to case 23-CR-362 and accepted Bond's no contest without repeating the effect of a no contest plea.

{¶ 55} Bond acknowledges the trial court properly informed him of the effect of his no contest plea in case 23-CR-752, but argues that the trial court wholly failed to explain the effect of his no contest pleas in case 23-CR-362. We disagree. The instant matter involved one sentencing hearing wherein the trial court accepted pleas in two cases, without interruption and moments apart. We find the trial court therefore properly informed Bond of the effect of his no contest pleas and Bond cites no authority which would support a conclusion to the contrary.

{¶ 56} The fourth assignment of error is overruled.

V

{¶ 57} In his final assignment of error, Bond argues his plea was not knowing, intelligent, or voluntary because his counsel rendered ineffective assistance. Specifically, he argues the outcome would have been the same had he elected to proceed to a jury trial and been found guilty as charged. He therefore argues he gained nothing by pleading and was therefore denied the effective assistance of counsel. We disagree.

### Ineffective Assitance

{¶ 58} To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate: (1) deficient performance by counsel, i.e., that counsel's performance fell

below an objective standard of reasonable representation, and (2) that counsel's errors prejudiced the defendant, i.e., a reasonable probability that but for counsel's errors, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–688 (1984); *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraphs two and three of the syllabus. "Reasonable probability" is "probability sufficient to undermine confidence in the outcome." *Strickland* at 694, 104 S.Ct. 2052.

{¶ 59} Defendants have a constitutional right to effective assistance of counsel during plea negotiations. *Hill v. Lockhart*, 474 U.S. 52, 58-59 (1985). In the context of pleas, "the mere fact that, if not for the alleged ineffective assistance, the defendant would not have entered the guilty plea, is not sufficient to establish the necessary connection between the ineffective assistance and the plea; instead, the ineffective assistance will only be found to have affected the validity of the plea when it precluded the defendant from entering the plea knowingly and voluntarily." *State v. Whiteman*, 2003-Ohio-2229 (11th Dist.) ¶ 24.

{¶ 60} We find the record demonstrates Bond was afforded a full Crim.R. 11 hearing and Bond does not argue otherwise. Transcript of sentencing (TS) 2-15. During the hearing Bond indicated he understood the plea and its possible consequences and that he was not threatened or induced into entering the plea. When asked if he was satisfied with his counsel, the following exchange took place:

> [Bond]: Not really. It's okay.
>
> The Court: Well, it's not okay. You just indicated you're not satisfied.
>
> I have to understand why.

[Bond]: I just feel like it…I don't know. I feel like a better job could have been done.

The Court: Well, Mr. Sabol, I would indicate to you, has fought hard and argued on your behalf and has presented motions to suppress and done everything that he can up to this point I think short of going to trial at this stage. That's what's left to do. I understand it may not be the results you are seeking right now, but it is what it is at this stage. So knowing that, does that change your opinion as to the representation you have receive?

[Bond]: No, it's alright.

{¶ 61} TS 10-11.

{¶ 62} Here on appeal, Bond complains entering pleas was not beneficial to him. But the record demonstrates that Bond would receive mandatory time regardless of whether he entered pleas or lost at trial due to the nature of his offenses. TS 5-11. So too, Bond did not receive a maximum sentence. If the trial court heard all of the facts at trial, it is possible that Bond's sentence could have been longer yet.

{¶ 63} Bond's dissatisfaction with his sentence, standing alone, does not establish his pleas were made any less than knowingly, intelligently, or voluntarily. Nor does his dissatisfaction establish either *Strickland* prong. Accordingly, the final assignment of error is overruled.

{¶ 64} The judgment of conviction and sentence of the Richland County Court of Common Pleas is affirmed.


By King, J.,

Hoffman, P.J. and

Baldwin, J. concur.